**BEIDLER & BOOKMYER, INC., v. UNIVERSAL INS. CO.**
**No. 169.**

Circuit Court of Appeals, Second Circuit.
March 6, 1943.

Before L. HAND, CHASE and FRANK, Circuit Judges.

Greenhill & Greenhill, of New York City (Simon Greenhill and Joseph Greenhill, both of New York City, of counsel), for appellant.

Bigham, Englar, Jones & Houston, of New York City (Francis X. Nestor, of New York City, of counsel), for appellee.

sured would cancel the policy if appellee did not assent to the change of brokers. As it would be frivolous to make the rights of the parties turn on needless formalities, we think the situation is just as if appellee had received from the insured a formal cancellation notice and a request for the issuance of a new policy and as if appellee had immediately accepted both. Since appellee did not control the insured, and the insured was under no obligation to appellant, the cancellation did not render appellee liable to appellant. As the policy was, in effect, cancelled on August 5, no premiums were thereafter earned thereunder, and therefore no commissions were due appellant; it had no contract with appellee as to the policy which existed after August 5, and performed no services after that date. Appellee was under no obligation to appellant to resist the instructions in the letter from the insured, or to question the latter as to whether and why it meant to insist upon the change of brokers. See Clinchy v. Grandview Dairy, 283 N.Y. 39, 27 N.E.2d 425; Degnan v. General Acc., F. & L. Assur., etc., Corp., 161 App. Div. 439, 146 N.Y.S. 360, affirmed 221 N.Y. 484, 116 N.E. 346.

■ There remains, however, the question of the so-called "good faith" of appellee. Appellee was obligated by its contract with appellant (a) not to exercise its privilege of canceling the policy for the sole purpose of getting rid of that contract and (b) not to induce the insured to cancel the policy solely to enable appellee to be rid of that contract. It is no answer that appellee had not agreed to be thus restricted. Such restrictions on "rights" need not always be a matter of agreement. True, once upon a time—and not so long ago—the word "contract" cast a curious spell on legal thinking.[1] It was then customary to say that, when men made a contract, they incurred no obligations except those which they actually intended, and that their actual intention must be found either in the explicit words of the contract or must be "implied" in those words. That assumption led to artificial and awkward reasoning. For instance, the courts developed the doctrine of concurrent conditions, although often the parties never intended such a result; in applying such and other kindred doctrines, it was said that, if the contracting parties had been reasonable men and had thought about the prob-

FRANK, Circuit Judge.

■ As the insured had no contract with appellant, it could, without liability to appellant, arbitrarily exercise its privilege of cancelling the policy, although its sole purpose in doing so was to terminate appellant's right to earn future commissions under that policy. The letter of August 5, 1941, from the insured to appellee, if reasonably construed, meant that the in-

---

[1] "Contracted such thinking," one might say.

lem, they would have intended a result which plainly they never intended.[2] Actually, what the courts were doing in those and many other instances was this: They attached many legal consequences to the act of entering into a contract without regard to whether the parties had or had not actually intended such consequences. The ground for annexing such obligations is the same as that for annexing many obligations to those noncontractual acts which are called "torts," namely that the courts consider that it is "just," i.e., that it is wise policy to do so.[3] The policy derives from the judicial belief that society will be better off if those obligations are exacted, or, to put it differently, if certain kinds of conduct will lead to court decisions terminating in enforceable court orders in the form of injunctions, execution sales and the like.[4] Sometimes this process is described by saying (as we have said recently) that a contract creates a status or relation;[5] it is now generally understood that the "feudal contract" did so, and everyone agrees that the marriage contract now does so. Holmes wittily summed up this revised attitude towards nonintentional contractual obligations in the remark that one may "commit a contract" as well as a tort.[6] The policy considerations which yield such nonintentional obligations are not static, but grow or decline with shifts in judicial views as to what is socially desirable; usually the social reference is elliptically expressed by talking of what a "reasonable man" would deem fair and honest.[7] It is far more wholesome for

[2] See, e. g., Dermott v. State, 1885, 99 N.Y. 101, 109, 1 N.E. 242; King v. Leighton, 1885, 100 N.Y. 386, 391, 3 N. E. 594; Genet v. President, etc., Delaware & H. Co., 1893, 136 N.Y. 593, 608, 609, 32 N.E. 1078, 19 L.R.A. 127; cf. Seagle, The Quest of Law (1941), Ch. XVI.

[3] See Kulukundis Shipping Co. v. Amtorg Trading Corp., 2 Cir., 126 F.2d 978, 990, 991 and note 43; 6 Williston, Contracts (Rev.Ed.1938) § 896 (pp. 2262–2263); cf. § 825 (pp. 2312–2313).

Of course when the courts have decided to attach such an obligation that fact sooner or later becomes known to many persons, and it can then be said that, in truth, they intend that obligation to be a part of their contracts made with such knowledge, unless they expressly stipulate against that obligation. Cf. Williston, loc. cit., § 615 (pp. 1767–1769). Some of those obligations can thus be precluded by an express contractual provision. Others cannot, e. g., a mortgagor cannot, in the mortgage contract, bargain away his "equity of redemption."

[4] Or to decisions denying such relief, as the case may be.

[5] United States v. Forness, 2 Cir., 125 F.2d 928, note 26 and authorities there cited; Kulukundis Shipping Co. v. Amtorg Trading Corp., supra; cf. Parev Products Co., Inc., v. I. Rokeach & Sons, Inc., 2 Cir., 124 F.2d 147, 149.

Some kinds of contracts give rise, it is said, to "fiduciary" status; see, e. g., Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 62 A.L.R. 1. In a certain sense, it can be said that almost all contracts create some "fiduciary" (i. e., "quasi-contractual") obligations.

[6] Holmes, Collected Legal Papers (1920) 175.

[7] The "reasonable man," as Pollock observed, was the common law way of taking over the "Natural Law" concepts of the Roman law and of Scholastic jurisprudence. Like the principles of "Natural Law," the applications of the "reasonable man" standard vary with time, place and circumstance. See Pollock, Essays on The Law (1922) 69; cf. 57. As to the flexibility in proper applications of scholastic "Natural Law" principles, see Lucey, Natural Law and Legal Realism, 30 Georgetown L.Rev. (1942) 493; excerpts from Thomas Aquinas, The Summa Theologica, in Hall, Readings in Jurisprudence (1938) 27, 30–31, 33, 35, 36, 39.

Fuller asserts that the courts do not today give sufficient heed to what is socially desirable (to what is "just" and "ought to be"), and seems to entertain the notion that they will more readily do so if only they will revert to the use of the phrase "Natural Law" to describe such considerations. See Fuller, The Law In Quest of Itself (1940); cf. Fuller, Reason and Fiat in Case Law, N.Y.L.J. October 28–30, 1942. It is doubtless true that, if everyone understood "Natural Law" to have the noble meaning which it has for persons like Fuller and Lucey, it would be an apt symbol for the duty of courts (within the limits set by well-established precedents and by statutes) to "do justice" according to principles acceptable to decent civilized men. Unfortunately, however, most persons who are not students of Scholastic jurisprudence (and some who purport to be) give other, and often conflicting, meanings to "Natural Law." Indeed, it is acknowledged even by Lucey that that name is often misunderstood and frequently creates problems "due to a confusion of terminology." As to the numerous conflicting

the courts in the contract cases to spell out their mental processes, and frankly to acknowledge that such policy considerations are at work in their decisions, than to conceal that fact (from themselves and others) behind the fictitious postulate that they are carrying out the parties' intentions.[8] Holmes, who once spoke of "the humbug of talking about the intention of the parties,"[9] sagely urged, on many occasions, that there should be candid judicial avowal of the judicial policy-making, and "interstitial" judicial legislation, unavoidably involved[10] in many decisions.[11] In all provinces of thought it usually promotes intelligence to bring out into the light the concealed actual postulates of thinking.[12]

Granting then that appellee owed appellant a duty not to bring about the destruction of appellant's right to commissions, the question here narrows down to this: Was there anything in the pleadings and affidavits before the trial judge which tended to show that, had he permitted the case to go to trial, there would have been evidence to support a finding that appellee induced the insured to cancel the policy in order to bring about the change of brokers. The only evidence suggested by appellee as having that tendency is that appellee's vice-president and the president of the insured were "regular luncheon companions" and "warm personal friends." That was not sufficient to raise such an issue of fact as to require a trial, i.e., there was not a "genuine issue" as to a material fact under Federal Rules of Civil Procedure, rule 56(c), 28 U.S.C.A. following section 723c.

Judgment affirmed.

---

[8] meanings given to that name, see, e. g., Haines, The Revival of Natural Law Concepts (1930); Ritchie, Natural Rights (1894) 20, 71ff.; Becker, The Declaration of Independence (1942), Ch. VI; Sabine, A History of Political Theory (1937); Pound, Law and Morals (1923); Pound, An Introduction to the Philosophy of Law (1922); Pound, The Revival of Natural Law, 17 The Notre Dame Lawyer (1942) 287; Schneider, Philosophical Differences Between The Constitution and The Bill of Rights, in The Constitution Reconsidered (1938) 143.

[8] Cf. Parev Products Co., Inc., v. I. Rokeach & Sons, Inc., supra.

[9] Holmes, Collected Book Notices (Ed. by Shriver, 1936) 172; for a statement by him of the older attitude, see Globe Refining Co. v. Landia Cotton Oil Co., 190 U.S. 540, 543, 23 S.Ct. 754, 47 L.Ed. 1171.

[10] To adhere to a precedent and by analogy to extend its application may involve policy-making, i. e., may involve the policy of extending the policy which inheres in the precedent.

[11] Holmes, Science and the Common Law (1879) reprinted in Holmes, Book Notices, supra 10–11; Vegelahn v. Guntner, 1896, 167 Mass. 92, 104, 105, 106, 44 N.E. 1077, 35 L.R.A. 722, 57 Am.St. Rep. 443; The Path of the Law, in Holmes, Collected Legal Papers (1921), 181, 184.

As to candid recognition of the propriety of judicial legislation, properly limited, see authorities cited in Commissioner v. Beck's Estate, 2 Cir., 129 F.2d 243, 245, and notes 3 and 4.

[12] As to the virtues of such "postulational thinking," and of the detection of concealed postulates, see Keyser, Thinking About Thinking (1916); Encyclopedia Britannica (14th Ed. 1929) Vol. 10, 174, 180; cf. Vol. 8, 802; Vol. 15, 88; Vol. 19, 90; Bell, The Search For Truth (1934); Bell, The Queen of the Sciences (1931) 20–36; Young, Fundamental Concepts of Algebra and Geometry (1911) 8042, 222–223; Adler, Dialectic (1927) 30, 126; Buchanan, Possibility (1927).