**MARTIN v. CAMPANARO et al.**

**In re SUBURBAN BUS CO., Inc.**
**No. 290.**

Circuit Court of Appeals, Second Circuit.
June 5, 1946.

**Writ of Certiorari Denied Oct. 21, 1946.**
See 67 S.Ct. 112.

Sidney N. Reich, of New York City, for objectant-appellee.

Poletti, Diamond, Rabin, Freidin & Mackay, of New York City (Daniel Kornblum and Murray A. Gordon, both of New York City, of counsel), for claimants-appellants.

Before CHASE, CLARK, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

■ 1. The Trustee has moved to dismiss the appeal on the ground that no one of the claimants has a claim which by any possibility can exceed $200, and that none of the claimants has asked this court for leave to appeal pursuant to § 24 sub. a of the Bankruptcy Act, 11 U.S.C.A. § 47, sub. a. But obviously the claims aggregate more than $500; the Referee passed upon the claims as a group; the claimants, in effect, consolidated their claims in their petition for review, without objection from the Trustee; and the judge treated them as if consolidated. Such consolidation was proper, under F.R.C.P. 42(a), 28 U.S.C.A. following section 723c, which applies here under General Order 37, 11 U.S.C.A. following section 53.

■ 2. We agree that the action of the National War Labor Board did not create rights, enforceable by the claimants, which will support their claims.[1]

■■ 3. But they can properly prove claims for the difference between the reasonable value of their services and the amounts paid. A contract implied in fact derives from the "presumed" intention of the parties as indicated by their conduct. When an agreement expires by its terms, if, without more, the parties continue to perform as theretofore, an implication arises that they have mutually assented to a new contract containing the same provisions as the old.[2] Ordinarily, the existence of such a new contract is determined by the "objective" test, i. e., whether a reasonable man would think the parties intended to make such a new binding agreement—whether they acted as if they so intended.

■ Applying that test, as it is applied by the New York (as well as most other) courts no new contract to continue on the old terms came into being here. In the light of the notice of April 19, 1944, from Amalgamated to Suburban, the subsequent unsuccessful negotiations, the activities of the Mediation Board, the hearings before the National War Labor Board, and the wartime no-strike pledge given by organized labor (of which we may take judicial notice), we think that a "reasonable man" would not believe that, when these employees continued to work, while their representative, Amalgamated, was making efforts to procure revised terms, they were agreeing to work, in the interval, at the old rates. No more, on these facts, could it reasonably be supposed that their signing the pay envelopes,

[1] See Employers Group of Motor Freight Carriers, Inc., v. N. W. L. B., 79 U.S.App. D.C. 105, 143 F.2d 145, certiorari denied 323 U.S. 735, 65 S.Ct. 72, 89 L.Ed. 589; N. W. L. B. v. Montgomery Ward & Co., 79 U.S.App.D.C. 200, 144 F.2d 528, certiorari denied 323 U.S. 774, 65 S.Ct. 134, 89 L.Ed. 619.

[2] New York Telephone Co. v. Jamestown Telephone Corp., 282 N.Y. 365, 26 N.E.2d 295; Miller v. Schloss, 218 N.Y. 400, 113 N.E. 337; Carpenter v. United States, 17 Wall. 489, 495, 21 L.Ed. 680; Baltimore & O. R. Co. v. United States, 261 U.S. 592, 597, 43 S.Ct. 425, 67 L.Ed. 816; 1 Williston, Contracts (Rev. ed., 1936) § 3; Restatement of Contracts, § 3 and § 5, comment a.

or their accepting the checks, was the equivalent of giving releases or waivers of their claims for additional compensation; for whether a receipt constitutes a release or waiver depends on the circumstances under which it was given.[3] Implications which would ordinarily stem from certain kinds of conduct are, of course, negatived by other conduct inconsistent with such implications.[4]

We think that here there was a contract "implied in fact" to pay the reasonable value of the services unless a new contract definitizing the wage-rates should be negotiated, and that, in the meantime, the employees accepted, merely on account, what was paid them.[5] Accordingly, there must be a hearing to determine the value of claimants' services.

Reversed and remanded.

[3] Cf. Meislahn v. Irving National Bank, 62 App.Div. 231, 70 N.Y.S. 988, affirmed 172 N.Y. 631, 65 N.E. 1119; Ryan v. Ward, 48 N.Y. 204, 8 Am.Rep. 539; Mosel v. William H. Frank Brewing Co., 2 App. Div. 93, 37 N.Y.S. 525.

[4] Summers v. Phenix Ins. Co., 50 Misc. 181, 98 N.Y.S. 226; New York Telephone Co. v. Jamestown Telephone Corporation, 282 N.Y. 365, 371, 26 N.E.2d 295; Chinnery v. Kennossett Realty Co., 286 N.Y. 167, 173, 36 N.E.2d 97; Williston, Contracts (Rev. ed., 1936) § 90, note 11.

[5] Williston, Contracts, §§ 91A, 146, 1029; Restatement, Agency, §§ 441, 443 (b).

This conclusion might be stated thus: The claimants are entitled to recover on a quantum meruit basis. But "quantum meruit" is ambiguous; it may mean (1) that there is a contract "implied in fact" to pay the reasonable value of the services; or (2) that, to prevent unjust enrichment, the claimant may recover on a quasi-contract (an "as if" contract) for that reasonable value. It has been suggested that the latter is a rule-of-thumb measure of damages adopted in quasi contract cases where the actual unjust enrichment or benefit to the defendant is too difficult to prove; see Costigan, Implied-In-Fact Contracts, 33 Harv.Law Rev. [1920] 376, 387.

The confusion involved in the use of the old phrase "implied contracts" to label both those "implied in fact" and those "implied in law" (now called "quasi contracts") has not been entirely obliterated. Nor is it easy to eradicate. Thus it is said that a quasi contract is "imposed by law * * * irrespective of, and sometimes in violation of, * * * intention" and therefore not a "true" contract, while a "true" contract (including a contract "implied in fact") arises from "intent." Williston, § 3; Woodward, The Law of Quasi Contracts (1913) § 4. But, where the courts apply the "objective" (i.e., behavioristic) test, they hold that a "true" contract exists despite the actual ("subjective") contrary intent of the parties; Williston, § 21; Restatement, Contracts, §§

70, 71, 503; Hotchkiss v. National City Bank, D.C., 200 F. 287, 293; cf. Ricketts v. Pennsylvania R. Co., 2 Cir., 153 F.2d 757, 760, 761, 762. In such cases, it might be said that a "true" contract, paradoxically, is but a kind of a quasi-contract—an "as if" contract—since it is "imposed by law irrespective of, and * * * in violation of, intent." In such cases, the courts, when a certain kind of conduct occurs, create an unintended legal "relation" (or "status") fully as much as if the intent to create it had been present. Corbin says that "the intent is immaterial"; Anson, on Contract (4th Am. Ed. by Corbin, 1930) p. 8 note; see also Williston, Mutual Assent in The Formation of Contracts, 14 Ill.L.Rev. (1919) 85, 87–88, 89; at 95 he rejects the suggestion that, under the "objective test," the liability imposed is quasi-contractual, but gives an unsatisfactory reason for that rejection. That feudal relations, which we ordinarily designate as those of "status," largely resulted from the "feudal contract"—United States v. Forness, 2 Cir., 125 F.2d 928, 936 note 25; Hume v. Moore-McCormack Lines, 2 Cir., 121 F.2d 336, 338 note 2; Beidler & Bookmyer v. Universal Ins. Co., 2 Cir., 134 F.2d 828, 830—goes to show how "contract" and "status" (or "relations") intertwine; cf., as to the "dialectic pairing" of "actus" and "status," Kenneth Burke, A Grammar of Motives (1945) 20, 41–42.

One encounters a similar paradox when the courts impose, on the parties to an intended contract, obligations which the parties never contemplated. Holland writes, "Supposing a contract to have been duly formed, what is its result? An obligation has been created between the contracting parties, by which rights are conferred on the one and duties imposed upon the other, partly stipulated for in the agreement, but partly also implied in law * * *" Holland, Jurisprudence (13th ed. 1924) 288. [Today we would say those obligations are imposed by the courts for reasons of public policy; see Beidler & Bookmyer v. Universal Ins. Co., 2 Cir., 134 F.2d 828, 829, 830; Kulukundis Shipping Co. S/A v. Amtorg Trading Co., 2

Cir., 126 F.2d 978, 990, 991; Parev Products Co., Inc., v. I. Rokeach & Sons, Inc., 2 Cir., 124 F.2d 147; Jacob & Youngs v. Kent, 230 N.Y. 239, 241, 242, 129 N.E. 889, 23 A.L.R. 1429; Williston, Contracts (Rev. ed. 1936) § 806 and § 825; cf. § 615; Corbin in Anson, loc. cit. § 353.]

It is, then, not as easy as is sometimes supposed to draw a sharp line between (1) obligations intentionally created (i.e., "contractual" in the sense of having been "voluntary," "intended") and (2) those which are quasi-contractual ("as if" or "fictional"). Note these puzzled remarks of Markby: "Why the liability of a trustee should not be considered a contractual liability is a question to which I do not find any very clear answer. The best answer I can give is that, though the duty comes into existence upon the consent of the parties, the nature of the duty is not under their control, and the remedy is not the same as on a breach of contract." Markby, Elements of Law, quoted in Keener, Selections on Jurisprudence (1896) 202. One might ask whether usually the "nature of the duty" of parties to a contract is entirely "under their control." That, in a sense, it might be said that almost all contracts create some kind of "fiduciary" (i.e., quasi contractual) obligations, see Beidler & Bookmyer, Inc., v. Universal Ins. Co., 2 Cir., 134 F.2d 828, 830 Note 5.

Something of the difficulty of precise analytical line-drawing in this field is reflected in the following remarks of Langdell: "Strictly, every obligation is created by the law. When it is said that a contract creates an obligation, it is only meant that the law annexes an obligation to every contract. A contract may be well enough defined as an agreement to which the law annexes an obligation. Strictly, also, a tort gives rise to an obligation as much as a contract, namely an obligation to repair the tort, or to make entire satisfaction for it; but this is an obligation which the law imposes upon a tort feasor merely by way of giving a remedy for the tort. In the same way, the breach of a contract gives rise to a new obligation to repair, or make satisfaction for, the breach." Langdell, A Brief Survey of Equity Jurisdiction, 1 Harv.Law Rev. (1887) 55, 56, note. Reflection on such considerations probably led to Holmes' famous remark, "If you commit a tort, you are liable to pay a compensatory sum. If you commit a contract, you are liable [at common law as distinguished from equity] to pay a compensatory sum unless the promised event comes to pass, and that is all the difference." Holmes, The Path of The Law, 10 Harv.L.Rev. (1897) 457, 462. Collected Legal Papers (1920) 167, 175. In The Common Law (1881) 301, he had said: "The only universal consequence of a legally binding promise is, that the law makes the promisee pay damages if the promised event does not come to pass"; cf. his opinion in Globe Refining Co. v. Landa Cotton Oil Co., 1930, 190 U.S. 540, 543, 23 S.Ct. 754, 47 L. Ed. 1171. In 1883 in a letter explaining his thesis, he said, " * * * I become less and less inclined to make much use of the old distinction between primary rights, duties and consequences or sanctioning rights or whatever you may call them. The primary duty is little more than a convenient index to, or mode of predicting the point of incidence of the public force." In 1928, he said that he did not mean "that a man promises either X or to pay damages. I don't think a man promises to pay damages in contract any more than in tort. He commits an act that makes him liable for them if a certain event does not come to pass, just as his act in tort makes him liable simpliciter." Holmes-Pollock Letters (1941) I, 20–21; II, 233; see also I, 79–80, 119, 177; II, 55, 200. For a disturbed reaction to Holmes' use of Occam's razor, see Buckland, Some Reflections on Jurisprudence (1945) 96–107.

See Costigan, supra, for the suggestion that both (1) "meeting-of-the-minds implied-in-fact contracts" and "no-meeting-of-the-minds implied-in-fact-contracts" are to be distinguished from (2) quasi contracts by the difference in the respective measures of damages; he says that in (1) the damages are on the contract basis, i.e., the loss to the plaintiff, but that in (2) the damages are measured by the unjust enrichment of, or benefit to, the defendant. However, as already noted, he observes that sometimes in (1) cases, when it is too difficult to measure the defendant's benefit, the courts use, as a rule-of-thumb, the reasonable value of plaintiff's performance; cf. Williston, § 3 (p. 10); Restatement of Restitution, § 107, comment b.

In the instant case, it makes no difference as to the amount of recovery whether the claims be grounded on a "contract implied-in-fact" or on a quasi contract. But we think it was a contract of the kind described in the text.