METROPOLITAN LIFE INSURANCE COMPANY, Plaintiff, *v.* JAMES H. DURKIN, as President of United Office & Professional Workers of America, et al., Defendants.

Supreme Court, Special Term, New York County, June 1, 1949.

*Burton A. Zorn, J. Alvin Van Bergh, Eugene Eiserman* and *S. Leslie Block* for plaintiff.

*Louis B. Boudin, Murray I. Gurfein* and *Sidney E. Cohn* for James Durkin, as president of United Office & Professional Workers of America, and another, defendants.

*Daniel W. Meyer* for William Frankfurt, as president of Industrial Life Insurance Company Agents Union, Local 30, defendant.

VALENTE, J. The plaintiff Metropolitan Life Insurance Company has brought this action for a judgment declaring that sections 213 and 213-a of the Insurance Law of this State prohibit the payment of certain retroactive increases in wages to the company's agents and for a judgment construing these sections of the law.

The action has been brought as a result of the determination of the United States Circuit Court of Appeals for the Second Circuit, reversing the District Court for the Southern District of New York, in the case entitled *Paris* v. *Metropolitan Life Ins. Co.* (167 F. 2d 834, certiorari denied 335 U. S. 827). The *Paris* case involves substantially the same parties as the present action and was brought by the agents, to compel the payment of the wages in question, the company having deposited in an escrow fund an amount sufficient to cover the disputed payments.

The District Court, after a trial (MANDELBAUM, J.) gave judgment for the plaintiffs, holding that the sections of the Insurance Law did not apply to collective bargaining situations and that, furthermore, the operation of these sections was superseded by the order of the National War Labor Board which awarded the increases effective as of the date of certification of the dispute to it. Upon appeal, the Circuit Court of Appeals, in an opinion by HAND, J., unanimously reversed the judgment of the District Court on the ground that the State question, i.e., the construction of sections 213 and 213-a of the New York Insurance Law, should be determined by the New York State Courts, and that until construction by the State

courts, there was no need to consider any of the Federal questions presented. Accordingly, the Circuit Court remanded the case to the District Court, with directions to retain jurisdiction pending the decision of the State question by the New York courts. A petition for a rehearing having been denied, a petition for certiorari was filed in the Supreme Court of the United States and it, too, was denied.

Subsequently, actions were commenced in this court by some of the individual agents for personal judgments against the company for their share of the increased compensation, but the latter, to comply with the direction of the Circuit Court of Appeals, started the present law suit and the individual actions were stayed by order of this court on the ground that the present case is more appropriate for testing the question of which the parties were directed to obtain a solution.

This litigation as well as its predecessor in the Federal courts constitutes in reality the latest battle in a labor conflict which has been raging since about September, 1942, between the plaintiff insurance company and the agents in its employ. The defendant, Local Union 30, was first certified as the bargaining representative of the agents in the metropolitan area in 1938 (*Metropolitan Life Ins. Co.* v. *Labor Rel. Bd.*, 280 N. Y. 194), and subsequently the defendant United Office and Professional Workers of America was certified as representing the agents outside of New York.

The dispute out of which this case arises revolved principally around the questions of compensation and '' union security '' and, the parties being unable to compose their differences and enter into a collective bargaining agreement, it was taken first to the Federal conciliator, and on October 24, 1942, was certified by the Secretary of Labor to the National War Labor Board. This board had been created by executive order of the President of the United States and had been given jurisdiction over all controversies likely to affect war production (Executive Order No. 9017; 7 Federal Register 237) following the conference held by the President with representatives of management and labor on December 17, 1941, at which labor had given its '' no-strike '' pledge, the purpose of the War Labor Board being to afford a practical means of adjusting labor disputes in wartime. Later on, by act of June 25, 1943 (War Labor Disputes Act; U. S. Code, tit. 50, Appendix, § 1501, *et seq.*), Congress gave statutory approval to the board.

Hearings in the dispute between the plaintiff and Local 30 were held before the Regional War Labor Board and during

the progress of the hearings, the parties settled all differences except the question of compensation and a collective bargaining agreement was concluded on May 7, 1943, which recited that the question of compensation was "being submitted to the War Labor Board". Subsequently the regional board awarded to the Local 30 agents an increase in compensation of $2.85 a week which was made retroactive to October 24, 1942, the date of certification to the board.

An appeal was taken to the National War Labor Board and similar disputes, limited to the question of compensation, which had arisen between the company and the United Office and Professional Workers involving agents in other States were also certified to the National War Labor Board. The board, after further hearings, on September 18, 1944, issued its order adopting the ruling of the regional board insofar as Local 30 was concerned and prescribing similar prospective increases in the other disputes making them retroactive to the date of certification.

Prior to the order of the National board the company and the union stipulated to submit to judicial decision the question of whether the New York statutes permitted the giving of retroactive effect to any increases which the board might order, and the company agreed to enter into collective bargaining agreements and to pay prospectively any increases ordered by the War Labor Board.

Following the award by the board collective bargaining agreements were entered into covering the prospective payments and the plaintiff deposited in escrow funds sufficient to meet the retroactive payments in the event such payments were held not to be barred by the sections of the Insurance Law of this State.

The pertinent portion of section 213 of the Insurance Law provides as follows: "No such company * * * shall pay or allow to any agent * * * for procuring an application of or a life insurance policy, for collecting any premium thereon or for any other service the form and connection therewith any compensation greater than that which has been determined by agreement made in advance of the payment of the premium * * * ". (Subd. 7.) Section 213-a refers to industrial life insurance and contains substantially identical language with respect to the payment for services in procuring an application for insurance, compensation "greater than that which has been determined by agreement made in advance of the rendering of such service." (Subd. 5.)

These provisions entitled in the law "Limitations of Expenses" or their equivalent, comprising section 97 of the older law, were originally enacted in 1906 (L. 1906, ch. 326), as part of a comprehensive legislative code regulating insurance companies in this State and as the result of an exhaustive investigation and report of a joint committee of the Legislature known as the Armstrong Committee, appointed for the purpose. The investigation disclosed, among other things, improper and discriminatory payments to agents who were related to officers and directors of the companies, as well as payments of unreasonable bonuses to certain agents dependent upon the volume of business obtained by them.

Both sides at the trial in the Federal Court, the record of which is in evidence here, as well as at the present trial, and in their briefs, refer at length to the conclusions of the Armstrong Committee that the companies were paying excessive compensation for business and were engaging in " wasteful measures " largely caused by undue competition for business and that favoritism and rebating were universally practiced. In its report to the Legislature the committee reported procedures to eradicate these and other evils and stressed specifically the objectionable efforts of the companies to obtain new business regardless of the expense, pointing out that " Extravagant commissions have been paid and these have been supplemented by liberal bonuses and prizes. Clubs have been formed, conventions held, and money lavishly expended for the entertainment of agents to excite them to their utmost endeavor." (Armstrong, Joint Legis. Comm. Report to Investigate Affairs of Life Ins. Companies [1905], vol. VII, p. 297.) It was further pointed out that highly wasteful expense lay in the amount voluntarily paid to agents in a competitive effort to obtain new business. (P. 129.) The committee concluded that " Some limitation of the expense in getting business is imperatively required." (Vol. VII, p. 305.) The suggestion was advanced that commissions should be uniform, and fixed in advance. Bonuses, prizes and rewards were frowned upon, as well as other special inducements based upon the size of particular policies or upon the aggregate of insurance written.

There can be no dispute that section 97 was placed in the law in 1906, to achieve the objectives pointed out by the Armstrong Committee and that the Legislature, in 1906 and again in 1939 and 1940 when the law was re-enacted as the present sections 213 and 213-a, was prompted by the intent to remedy the vices pointed out and to prevent their recurrence.

As Judge MANDELBAUM pointed out in his opinion in the District Court action (68 F. Supp. 64, 66): "Unfortunately, the court is without guidance with respect to any judicial construction or interpretation of these provisions, there having been none since the time of their original enactment 40 years ago and the re-enactment in substantially the same form in 1939".

In the absence of such prior judicial pronouncement it becomes of paramount importance to scrutinize the historic background of the legislation and to ascertain the true intent of the lawmakers as well as the real purpose sought to be attained. The spirit of the law and the intention prompting its enactment provides keen insight into its real meaning.

The literal meaning of words or phrases should never be permitted to pervert the purpose of the law. In the construction of a statute, words and language always yield to what appears to have been the intention of the lawmakers. (*Vail* v. *Railroad Co.,* 147 N. Y. 377, 381.) In the recent case of *People* v. *Ryan* (274 N. Y. 149, 152), the Court of Appeals stated the rule as follows: "In the interpretation of statutes, the spirit and purpose of the act and the objects to be accomplished must be considered. The legislative intent is the great and controlling principle. Literal meaning of words are not to be adhered to or suffered to 'defeat the general purpose and manifest policy intended to be promoted;' all parts of the act must be read and construed together for the purpose of determining the legislative intent, and if the statute is ambiguous and two constructions can be given, the one must be adopted which will not cause objectionable results or cause inconvenience, hardship, injustice or mischief or lead to absurdity."

Much earlier in the case of *People ex rel. Jackson* v. *Potter* (47 N. Y. 375, 379) there is the following: "The intent of the law-maker is to be sought for. When it is discovered, it is to prevail over the literal meaning of the words of any part of the law. And this intent is to be discovered, not alone by considering the words of any part, but by ascertaining the general purpose of the whole, and by considering the evil which existed calling for the new enactment, and the remedy which was sought to be applied".

The litigants are in agreement that originally these provisions were placed in the Insurance Law for the protection of the policy holders and with the intent to regulate and keep down the legitimate expenses of the insurance companies by prohibiting the discriminatory payment of bonuses, prizes, awards and

excessive commissions as well as all kindred practices which the Legislature felt had caused the unsavory situation in which the companies found themselves.

As early as 1907, the State Superintendent of Insurance gave as his written opinion: " I think the language (section 97) was used deliberately to prohibit any added compensation being paid to an agent of an insurance company by any subsequent arrangement made after their original contract was entered into".

The Legislature intended to prevent the recurrence of the evils recited by its joint committee.

The payments involved here do not come within such category. They do not represent discriminatory awards or bonuses forming a part of a scheme or arrangement to reward favorites nor to increase the business done or profits anticipated by the company.

The whole history of the controversy pointed up by this case beginning with the certification of the union as the bargaining agent followed by attempted conciliation and ultimate certification of the dispute to the War Labor Board demonstrates the existence of a bona fide labor dispute between the management of the plaintiff company and the agents employed by it. There has been no accusation by either side, nor even the faintest breathing of a suspicion, that the other party has not always acted in the best of faith. On one hand, the workers, impelled to strive for a more decent wage due to the ever increasing stringencies of more difficult economic conditions; on the other, the company honestly defending its position as in the best interests of its real owners, the policyholders. The contest finally ends in the award made by the War Labor Board involving a retroactive provision covering the amount awarded from the date of certification of the dispute. There can be no question of a scheme or arrangement to endanger the rights or interests of policyholders. In fact, it seems evident that the interests of policyholders are better protected by an increase in the pay of underpaid employees as determined by an impartial tribunal than by risking the dangers of a strike of workers no longer able to cope with economic stress. Certainly the advantages to the entire community which are now universally credited to collective bargaining procedures are participated in by the plaintiff's policyholders. It comes with poor grace for the plaintiff now to assume credit for the virtue forced upon it by the Legislature which adopted the disciplinary provisions in the Insurance Law.

There is not the slightest indication that the Legislature ever intended to limit or circumscribe the operation of the collective bargaining machinery which it set up in the pertinent provisions of the Labor Law. (Labor Law, §§ 700–716, 750–758.) The State Labor Relations Act clearly states that "It is in the public interest that equality of bargaining power be established and maintained". (Labor Law, § 700.) The same section denounces strikes, lockouts and other forms of industrial strife and unrest and contains a declaration of the public policy of the State to "encourage the practice and procedure of collective bargaining".

It is futile to argue that the Legislature intended by the provisions of the Insurance Law to prevent the agents from participating in the benefits of the Labor Relations Act. A strict interpretation of these provisions could lead to no other result. Negotiations and hearings necessitate longer delays than can reasonably be guarded against. (*Matter of Sheffield Steel Corp.* 15 War Lab. Rep. 658.)

The Insurance Law and the Labor Law form statutory signposts along the road which all must travel in the exercise of rights under the law; they are equally important and fulfill a necessary purpose in the promotion of the common good. Neither may be needlessly circumscribed or limited without a clear expression of legislative intent to lessen their effectiveness.

Violence would be done to the recognized customary canons and rules of construction and interpretation to read into the sections in question an intent on the part of the Legislature to require an agreement between the company and the agent as an indispensable essential condition to entitle the agent to receive compensation from the insurance company.

Consulting the facts which form the historic background for the enactment the conclusion is inescapable that the Legislature never intended to punish or penalize the agent. The evils were laid at the company's door and were held to have resulted from the bad practices of the companies and those in control of them. All penalties are directed at the company. The Legislature was not blaming the agents for the deplorable conditions and certainly did not use any language from which we may infer that if an agreement for compensation failed through no fault of either company or agent no payment of compensation earned could be made lawfully thereafter by the company. Such a result would be unrealistic and highly fanciful. The plaintiff must fail in the contention advanced in its behalf that if agents worked

without an agreement they would not be entitled to receive nor Metropolitan to pay any commissions.

It seems to me, therefore, that the conclusion is inescapable that while the intent of the lawmakers was to prohibit and prevent intentional and voluntary payments of excessive commissions or compensation in addition to those provided in an existing agreement previously entered into between the company and the individual agent, there was no intent on the part of the Legislature to interfere with the payments such as those involved in this case.

A careful reading of the language used in these sections leads also to the conclusion that what was intended to be forbidden was voluntary retroactive payments by the company in addition to an amount previously agreed upon.

Again it is helpful to keep in mind that this lawsuit is not so much a debate over the meaning of a particular statute as it is a question of labor-management relations.

Prior to the certification of the union as bargaining representative the individual agents and the company were bound by the provisions of the individual contracts. With the notification to the company by the union as the bargaining representative of the employees the individual contracts, so far as compensation was concerned, ceased and terminated. This change in industrial relations has been brought about by the National Labor Relations Act and its counterpart in our New York Labor Law. The very nature of both statutes is to supersede the terms of separate agreements of the employees with terms which reflect the strength and bargaining power and serve the welfare of the group. (*J. I. Case Co.* v. *National Labor Rel. Bd.* 321 U. S. 332, 337-338.) No longer may the employer bargain with the individual employee or with anyone other than the chosen representatives of his employees. (*Medo Photo Supply Corp.* v. *National Labor Rel. Bd.,* 321 U. S. 678, 684.) The individual agreement ends with the notification to the employer by the selected bargaining agent that a new collective agreement is demanded. In the present case any agreement subsisting previously between the individual agents and the company ended with the demand by the union for negotiations. Under both National and State labor laws the insurance company was obliged to negotiate (*National Labor Rel. Bd.* v. *Jones & Laughlin Steel Co.,* 301 U. S. 1; *Matter of N. Y. State Labor Rel. Bd.* v. *Loehmann Corp.,* 269 App. Div. 566). The new agreement as to compensation eventuates as the result of negotiations conducted by virtue of statutory compulsion and the result is a brand new contract.

Sections 213 and 213-a by their language prohibit the payment of " any compensation greater than that which has been determined by agreement made in advance * * * " The rulings of the Superintendent of Insurance interpreting this language which are in evidence as part of the record in the Federal case and which the plaintiff urges are persuasive clearly state that the sections hold that no " added compensation " or " additional compensation " can be paid after a contract has been made. While we have no judicial construction of these sections we have a reliable guide in the decisions construing the words extra compensation as used in the State Constitution (art. IX, § 10). " Extra compensation is compensation over and above that fixed by contract or by law when the services were rendered." (*Matter of Mahon* v. *Board of Education,* 171 N. Y. 263, 266–267.) In *Porter* v. *Fletcher* (153 App. Div. 470, 472, affd. 211 N. Y. 524), it was pointed out that the evil sought to be remedied by the constitutional provision seems to be " an increase of compensation for services theretofore rendered, which would be in the nature of a gratuity "; and in *Matter of Bareham* v. *Board of Supervisors* (247 App. Div. 534, 538), the court said: " The mischief sought to be eradicated was the granting of gratuities, something given voluntarily for nothing ". Similarly in *Cole* v. *State of New York* (102 N. Y. 48, 59), it was held that where an agreement covering compensation was subsequently found to be invalid under the Federal Constitution, the employees who rendered the services were not barred from recovery by the provision in the State Constitution. The court conceded (p. 59) that a strict reading of the language applied but the payment of such compensation " does not come within the evils at which the constitutional prohibition was aimed."

The Administrative Code of the City of New York (§ 67–1.0) forbids retroactive increases of salary of any officer or person, whose salary is paid out of the city treasury. In a taxpayer's action to enjoin the payment of retroactive compensation to certain city employees who had commenced a proceeding for additional pay, the city agreed to pay the increase. In giving judgment for the defendant Mr. Justice McNALLY said: " To the extent the city does not pay the prevailing rate of wages, it is unjustly enriched. Section 67–1.0 of the Administrative Code is inapplicable. It is aimed at retroactive application of increases of salaries. Increases imply an existing valid lesser obligation ". (*Evadan Realty Corp.* v. *Patterson,* 192 Misc. 850, 855.)

" Extra " compensation differs in no recognizable aspect from " additional " compensation. Either phrase conveys the idea of an " increase " over a previously agreed or established amount. The sections of the Insurance Law are aimed at a voluntary, gratuitous payment by way of bonus or gift. Before we can have an extra or additional compensation there must be an amount fixed by contract or by law (*Matter of Mahon* v. *Board of Education, supra*).

The original individual contracts having been terminated so far as compensation was concerned, the award made by the War Labor Board is not " compensation greater than that which has been determined by agreement made in advance " in the strict sense of the language used in the statute.

The language of the statute does not compel an advance agreement as a prerequisite to the agent's right to compensation. This is not the same as saying that once a valid binding agreement comes into existence no retroactive increase can validly be granted or paid voluntarily by the company. It is increased compensation in the latter sense which is condemned by the language of these sections. In the present case the Insurance Law should not be utilized to prevent something not clearly intended by the Legislature.

This view is fortified strongly by proof that payment of the retroactive benefits will be well within the statutory ceiling respecting the aggregate of expenses that may be incurred by the Metropolitan.

The plaintiff argues that the uniform rulings of Superintendents of Insurance charged with the interpretation and enforcement of the Insurance Law that payment of any and all types of retroactive increases to agents is prohibited must be given great weight by the court in determining the exact meaning of the statute. This position is supported by such cases as *Bullock* v. *Cooley* (225 N. Y. 566) and *Palmetto Fire Ins. Co.* v. *Conn* (272 U. S. 295). I agree with the observation of Judge MANDELBAUM (63 F. Supp. 64, 67, *supra*) and find no fault with plaintiff's assertion except that " the court is mindful of the fact that the rulings of the Superintendent cited indicate situations not parallel nor even similar to what we have before us. In those cases, no dispute or submission to impartial arbitration is shown, but merely indicate that the rulings were made pursuant to the inquiries on the part of the insurance companies to the Superintendent as to whether or not they could voluntarily make retroactive payments to their employees. Both a reading of

the sections and the opinions of the Superintendent of Insurance shows that they were meant to apply only to increases in compensation given by the *voluntary* act of the company and not where retroactive increases as here were ordered by a government agency as a result of a bona fide labor dispute.''

The effect of the testimony of the superintendent at the trial as to the views he expressed in February, 1944, in response to a letter received by him from the plaintiff is weakened considerably by the indisputable facts with reference to the payment by the John Hancock Insurance Company of retroactive increases similar to those involved in this case. The dispute between the John Hancock Company and the union was certified to the National War Labor Board which issued a directive ordering the payment of both prospective and retroactive increases. The John Hancock Company, doing business in this State and subject accordingly to the jurisdiction of the New York State Superintendent of Insurance, paid the amounts of the retroactive increase as awarded. Although the matter was brought to the attention of the superintendent, no action has been taken against the John Hancock Company or any of its officers. The superintendent testified that, upon receiving proof that the company and the union had agreed that if the War Labor Board made a retroactive increase the company would pay it, he reached the conclusion that he would make no formal ruling whether or not the payment of such retroactive increases by the insurance company constituted a compliance with section 213 or 213-a. The superintendent stated: '' It was pointed out that nobody contemplated that any retroactive award in excess of the statutory ceiling provided by law would take place, and, in substance, they said that the parties were agreed, but that the mechanical detail of determining what the actual amount should be within the limitations fixed by the expense limitation law was to be left to the War Labor Board ''. There can be no dispute over the fact that the amount of the retroactive wage was not determined in advance, and the provisions of sections 213 and 213-a would seem to be equally applicable to the John Hancock Company and to the plaintiff. This result is reached even if it be assumed that there was neither an express nor an implied agreement by this plaintiff to be bound by the award of the War Labor Board, and certainly there is nothing in the record of this litigation from which any reasonable person would conclude that these agents agreed to work at the old rates during the lengthy interval between notification by the collective bargaining agent and the ultimate

determination of the dispute by the War Labor Board. As in the case of *Martin* v. *Campanaro* (156 F. 2d 127, 129, FRANK, J.): "Applying the test, as it is applied by the New York (as well as most other) courts no new contract to continue on the old terms came into being here. In the light of the notice * * * the subsequent unsuccessful negotiations, the activities of the Mediation Board, the hearings before the National War Labor Board, and the wartime no-strike pledge given by organized labor (of which we may take judicial notice), we think that a ' reasonable man ' would not believe that, when these employees continued to work, while their representative, Amalgamated, was making efforts to procure revised terms, they were agreeing to work, in the interval, at the old rates.''

In any event, the agreement between the union and the John Hancock Company would not alter the fact that the amount of the payment made by the company was not agreed upon in advance.

The case of *Martin* v. *Campanaro* (*supra*) was the basis of the determination reached by the Supreme Court of the State of Washington, in a case somewhat analogous to the present one. (*Christie* v. *Port of Olympia*, 27 Wn. [2d] 534.) That was a taxpayer's action to restrain a municipal corporation from paying retroactive additional compensation to dockworkers whose wages, for many years, were the minimum as fixed by an agreement between the union and the employers' association. A dispute which arose between the union and the employers was submitted to the War Labor Board and, pending an award, the old rate of pay was continued but the employers' association as well as the port manager agreed that if an increase was directed it should be retroactive. After the decision of the War Labor Board a taxpayer's suit was brought and it was urged that the retroactive payment was a gift by the municipality and hence forbidden or that it violated a constitutional prohibition against the grant of any extra compensation after " services shall have been rendered or the contract entered into ''. The court held (p. 543) that " there is no merit to these contentions. The payments are neither gifts nor ' extra compensation ' ''. Assuming that the manager had authority to make the agreement with the union the court stated " the payments represent compensation which accrued in strict pursuance to a contract made before the work was done. * * * it is merely deferred compensation that was provided for in the contract * * * the payments claimed under the alleged contract * * * were earned day by day according to the terms thereof. Payments were merely deferred.'' (Pp. 543–544.)

In the present case the individual agreements as to the amount of compensation being terminated, the new amount could not be ascertained until the War Labor Board made its award. The amount of the award was the amount earned day-by-day from the date of certification at least. The payment was deferred.

In the absence of clear proof that the intent and purpose of sections 213 and 213-a of the Insurance Law or the express provisions of the sections compel the construction urged by the plaintiff this court should not so interpret the law.

Judgment is given accordingly in favor of the views urged by the defendants and declaring that the provisions of sections 213 and 213-a of the Insurance Law do not operate to prohibit the payment of the increases awarded retroactively by the War Labor Board and specified in the agreement between the plaintiff and the unions.

The facts necessary to this decision are found as set forth herein.

The present ruling is specifically confined and limited to the facts and circumstances disclosed by this litigation. It is not intended to affect the application or. operation of the salutary provisions of sections 213 and 213-a of the Insurance Law in a proper case.

The problem raised by the defendants' contention that applicable provisions of Federal law have superseded the provisions of the Insurance Law of the State need not be considered in view of the conclusion reached in this case and, in any event, would seem to have been reserved by the opinion of the United States Circuit Court of Appeals.

The foregoing constitutes the decision with the findings of fact and conclusions of law essential to the disposition.

Settle judgment.