978 A.2d 222

**Robert W. FOLEY, Jr., et al.**

v.

**K. HOVNANIAN AT KENT ISLAND, LLC.**

**No. 35 Sept.Term, 2007.**

Court of Appeals of Maryland.

Aug. 21, 2009.

C. Daniel Saunders (Cristina Hardin Landskroener, Chestertown, MD), on brief, for Petitioners.

Brief of Amicus curiae, Chester River Ass'n, Inc.: Thomas A. Deming, Annapolis, MD.

Brief of Amicus Curiae The Chesapeake Bay Foundation, Inc.: Jon A. Mueller, Esquire, Amy E. McDonnell, Esquire, Annapolis, MD.

John H. Zink, III (Venable, L.L.P., Towson, MD; Nancy L. Slepicka of O'Malley, Miles, Nylen & Gilmore, P.A., LaPlata,

MD), on brief; Joseph A. Stevens of Stevens, Phillips & McCann, L.L.C., Centerville, MD, on brief, for Respondent.

ARGUED BEFORE BELL, C.J., RAKER *, HARRELL, BATTAGLIA, JOHN C. ELDRIDGE, (Retired, specially assigned), ALAN M. WILNER, (Retired, specially assigned) and DALE R. CATHELL, (Retired, specially assigned), JJ.

BELL, Chief Judge.

## I. Introduction

The Chesapeake Bay is nothing short of magnificent. For decades, fishermen found plentiful supplies of blue crabs, clams and oysters in its waters. Over time, however, the results of increased human activity on, in and near the Bay saw its deterioration and the decrease in the fruits it bore. In 1984, the Maryland General Assembly responded in part. It enacted the Chesapeake Bay Critical Area Protection Program ("the Program"), *see* Maryland Code (2007 Repl. Vol.) §§ 8–1801 to 8–1817 of the Natural Resources Article, to counteract the increasing levels of deterioration that human activity near the Chesapeake Bay's waters and habitats was causing. The Program required all local jurisdictions, under the direction of a newly created Chesapeake Bay Critical Area Commission, to formulate and implement a plan to control development near certain shoreline areas. § 8–18 01(b)(1)-(b)(2). Queen Anne's County adopted such a Critical Area Program, the provisions of which were set forth in Queen Anne's County Code, Environmental Protection Article, Chapter 14.

The Queen Anne's County program divides land within the Critical Area into three development categories: Resource Conservation Area ("RCA"), Limited Development Area ("LDA") and Intensely Developed Area ("IDA"). Develop-

---

* Raker, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, she also participated in the decision and adoption of this opinion.

ment on land in the RCA is highly restricted; only one dwelling per 20 acres is permitted. Land within the LDA is subject to fewer development restrictions; however, that area only allows impervious surfaces to comprise 15% of the development that occurs in that designated area. The IDA, the least restrictive development classification, allows most land uses, although it does require strict adherence to performance standards for storm water runoff. In addition, consistent with, and as permitted by, § 8–1808.1(b) [1] of the Natural Resources Article, Queen Anne's County retained a growth allocation.[2] Section 8–1808.1(c) permits a local jurisdiction to retain the power to reclassify land designated as RCA into either or both of the less restrictive development categories, IDA or LDA. Nevertheless, before the Queen Anne's County Commissioners may grant a growth allocation petition, approval from the Critical Area Commission first must be obtained. Q.A.C.C. § 14:1–77(E).[3]

---

1. § 8–1808.1(b) of the Natural Resources Article provides:

"(b) *Calculation of growth allocation.*—The growth allocation for a local jurisdiction shall be calculated based on 5 percent of the total resource conservation area in a local jurisdiction:

"(1) In the Chesapeake Bay Critical Area at the time of the original approval of the local jurisdiction's program by the Commission, not including tidal wetlands or land owned by the federal government; or

"(2) In the Atlantic Coastal Bays Critical Area at the time of the original approval of the local jurisdiction's program by the Commission, not including tidal wetlands or land owned by the federal government."

2. Maryland Code (2007 Repl. Vol.) § 8–1802(a)(11) of the Natural Resources Article defines "Growth Allocation" as "the number of acres of land in the Chesapeake Bay Critical Area or Atlantic Coastal Bays Critical Area that a local jurisdiction may use to create new intensely developed areas and new limited development areas." Queen Anne's County Code § 14:1–11 defines "Growth Allocation" as "[a]n area of land calculated as 5% of total resource conservation area designated land within the critical area (excluding tidal wetlands and federally owned land), that the County Commissioners may convert to more intensely developed areas."

3. Q.A.C.C. § 14:1–77(E) states:

"Critical Area Commission approval. All growth allocation petitions that receive conceptual approval by the County Commissioners will be forwarded to the Critical Area Commission for review and approv-

K. Hovnanian at Kent Island, LLC ("Hovnanian"), the respondent, is the developer of Four Seasons at Kent Island ("Four Seasons"), an "active adult, age restricted" community, located in Queen Anne's County, Maryland. The plans for Four Seasons provide for 1,350 dwelling units, an assisted living facility and various community and recreational amenities, to be constructed on approximately 560 acres of land situated within the Chesapeake Bay Critical Area. Hovnanian thus was required to request that the Queen Anne's County Commissioners exercise their authority to reclassify the retained growth allocation so that more intensive development could occur on certain portions of the proposed site.

Article XV, § 14:1–76 [4] of the Queen Anne's County Code ("Q.A.C.C."), outlines the steps that an applicant seeking a

---

al. No award of growth allocation shall become effective until after the County Commissioners have taken final legislative action on the petition."

4. Q.A.C.C. § 14:1–76 reads:
" § 14:1–76. *Growth allocation process.*
"The County's growth allocation will be used to amend the development area classification on the Official Critical Area Maps on a project-by-project basis. The following procedures will be followed in determining if a site qualifies for growth allocation:
A. Prior to submitting a petition to the County Commissioners for map amendments utilizing the growth allocation, applicants shall submit a sketch or concept plan to the Planning Commission, together with a fee as prescribed by the Planning Commission. The Planning Commission will review the sketch or concept development plan for consistency with the County's Critical Area Program and will provide technical comments and recommendations. The applicant shall incorporate the Planning Commission's technical comments and recommendations into the petition filed with the County Commissioners.
B. All petitions for map amendments utilizing growth allocation shall be accompanied by a concept site plan or subdivision sketch plat, prepared in conformity with the requirements of the Queen Anne's County Zoning Ordinance in addition to any information required by § 14:1–77A of this Chapter 14:1.
C. In approving a map amendment utilizing the growth allocation, the County Commissioners may establish additional conditions of approval that are consistent with the intent of the Queen Anne's County Critical Area Program.
D. Review criteria. The following review criteria will guide the selection of projects that may be assigned growth allocation:

growth allocation must follow. In conformance with that provision, Hovnanian submitted a concept plan (the "2000 Growth Allocation Plan") and a Petition for Growth Allocation to the Queen Anne's County Commissioners on June 9, 2000. The 2000 Growth Allocation Plan was a plat that depicted the acreage and location of the land Hovnanian wanted the Commissioners to reclassify from RCA to either LDA or IDA. On June 13, 2000, the County Commissioners forwarded Hovnani-

---

(1) Proposed development projects using growth allocation must be determined to be consistent with the Queen Anne's County Comprehensive Plan and Queen Anne's County Critical A rea Program and the Growth Subarea Plans.

(2) Proposed development projects that implement specific development or redevelopment objectives of the Comprehensive Plan or a Growth Subarea Plan shall be given priority for growth allocation, and growth allocation is set aside for implementation of these projects in the Growth Management Pool.

(3) Proposed development projects determined by the County to be of substantial economic benefit and located in a designated growth area shall be given priority for growth allocation, and growth allocation is set aside for implementation of these projects in the Growth Management Pool.

(4) Proposed development projects located outside of designated growth areas may be assigned growth allocation if they are a commercial, industrial, residential or institutional project determined to be of substantial economic benefit to residents of the County and/or meet a recognized public need. Growth allocation for implementation of these projects may be from either the General Pool or the Growth Management Pool.

E. Minimum mandatory design standards. Once the maximum permitted density of development has been determined, the proposed project must demonstrate that it will meet or exceed the following design standards in order to be approved:

(1) All applicable requirements of the Queen Anne's County Zoning Code, the Subdivision Regulations and the Queen Anne's County Chesapeake Bay Critical Area Program and Act have been met.

(2) A land management classification change has been approved by the County Commissioners and the Critical Area Commission.

(3) The design of the development enhances the water quality and resource and habitat values of the area, e.g., results in additional planting of forest cover in the Buffer or implementation of best management practices on portions of the site to be retained in agriculture use.

(4) The development incorporates the comments and recommendations of the County and the Maryland Fish, Heritage and Wildlife Administration in the project design.

an's Petition for Growth Allocation and the 2000 Growth Allocation Plan to the Queen Anne's County Planning Commission, which conducted a public hearing and recommended that Hovnanian's Growth Allocation Petition be approved, with several conditions. The County Commissioners accepted that recommendation, granted "conceptual approval" to Hovnanian's Petition for Growth Allocation and forwarded the Petition to the Chesapeake Bay Critical Area Commission for approval. The Critical Area Commission, following a public hearing and public comment, approved Hovnanian's Petition and the 2000 Growth Allocation Plan.

The County Commissioners held a public hearing on Hovnanian's Petition, following which it made "Findings of Fact." Subsequently, the County Commissioners passed Resolution No. 01–13, proposing to approve Hovnanian's Growth Allocation Petition, subject to numerous conditions. One of the conditions was that Hovnanian "enter into a legally binding Developers Rights and Responsibilities Agreement with the County." The County Commissioners then referred their proposed approval, along with the outlined conditions, back to the Critical Area Commission for its review and approval.

Hovnanian prepared an Amended Concept/Sketch Plan that incorporated the conditions imposed by Resolution No. 01–13. This Amended Concept/Sketch Plan (the "2001 Growth Allocation Plan"), referencing the conditions, included a revised Growth Allocation Plan that was labeled and referred to as "Sheet 7 of 8." The County's Planning Commission and the Critical Area Commission approved Hovnanian's 2001 Growth Allocation Plan. Subsequently, with the enactment of Ordinances 01–01 and 01–01A on August 21, 2001, the Queen Anne's County Commissioners approved Hovnanian's 2001 Growth Allocation Plan. Together, Ordinances 01–01 and 01–01A granted Hovnanian the Growth Allocation it sought. Ordinance 01–01 provided, in relevant part:

> (5) The developer executes restrictive covenants that guarantee maintenance of any required open space areas."

"FOR THE PURPOSE of utilizing Critical Area Growth Allocation to redesignate 293.25 acres of property near Stevensville, Maryland from Resource Conservation Area (RCA) to Intense Development Area (IDA) and to utilize pre-mapped growth allocation to redesignate 79.55 acres of land from Limited Development Area (LDA) to Intense Development Area (IDA) by amending part of parcels 7, 8 and 11 on Queen Anne's County Official Chesapeake Bay Critical Area Map No. 49 and Parcels 1, 8, 347 and 532 on Official Chesapeake Bay Critical Area Map No. 57."

Ordinance 01–01 also provided:

"BE IT ENACTED BY THE COUNTY COMMISSION-ERS OF QUEEN ANNE'S COUNTY, MARYLAND that Title 14 of the Code of Public Local Laws of Queen Anne's County (1996 Ed.) be amended by the repeal of Official Chesapeake Bay Critical Area Map Nos. 49 and 57 *and the adoption of the attached Map Nos. 49 and 57* as the Official Chesapeake Bay Critical Area Map Nos. 49 and 57." (Emphasis Added).

Ordinance 01–01A conditioned approval given by the County Commissioners of the Hovnanian Growth Allocation Petition both on Hovnanian entering into a Developer Rights and Responsibilities Agreement with the County and satisfying the conditions imposed on the project by its earlier conditional approval of Resolution No. 01–13.

It is undisputed that, when the Queen Anne's County Commissioners enacted Ordinances 01–01 and 01–01A on August 21, 2001, no Critical Area Overlay Maps [5] were attached to the

---

**5.** Critical Area Overlay Maps are transparent overlays that literally are placed on top of Queen Anne's County Zoning Maps. The Zoning Maps, in turn, are based on tax maps prepared by the Maryland Department of Assessments and Taxation ("SDAT Maps"). The respondent concedes that there will be "inherent inaccuracies" between the Critical Area Overlay Maps and the SDAT Maps because the SDAT Maps, which the Zoning Maps are based on, are not created based on an actual survey. The potential for inaccuracies is openly acknowledged on the SDAT Maps: "The information shown hereon has been compiled from deed descriptions and is not an actual survey. It should not be used for

Ordinances. Instead, several months later, on December 4, 2001, the Queen Anne's County Commissioners signed Overlay Maps 49 and 57 (the "2001 Overlay Maps"). There were cartographic errors on the 2001 Overlay Maps, however. Therefore, revised Overlay Maps were drafted and submitted to the County Commissioners on October 8, 2002 (the "2002 Overlay Maps").

After litigation commenced in this case, the Circuit Court for Queen Anne's County appointed an independent surveyor to evaluate whether the 2002 Overlay Maps accurately depicted Hovnanian's 2001 Growth Allocation Plan. The surveyor's report determined that the 2002 Overlay Maps also contained a cartographic error—the maps wrongly classified as in IDA 7.5 acres of property belonging to a third-party, when that property actually was classified RCA—a fact that Hovnanian acknowledged in open court to be correct.

## II. Procedural History

Kent Island resident Robert W. Foley, along with three other individual plaintiffs and Queen Anne's Conservation Association, Inc. (the petitioners), filed, in April of 2005 in the Circuit Court for Queen Anne's County, a complaint for declaratory and injunctive relief. In that action, they challenged the validity of Ordinances 01–01 and 01–01A. Hovnanian intervened in the litigation as a defendant and filed a Motion for Summary Judgment. After twice amending their complaint, the plaintiffs filed their own Motion for Summary Judgment. After three hearings on the Cross–Motions for Summary Judgment, the Circuit Court issued a Memorandum Opinion and entered Judgment in favor of the plaintiffs. That judgment enjoined Hovnanian from utilizing the County's award of growth allocation until accurate Critical Area Overlay Maps had been drafted. Hovnanian responded by motioning both to alter or amend the judgment, pursuant to Maryland Rule 2–534, and to modify the injunctions. Hovnanian's

legal descriptions. Users noting errors are urged to notify the Property Map Division...."

Motion to Alter or Amend the Circuit Court's Judgment argued, as relevant here, that accurate Overlay Maps, delineating where the growth allocation had been awarded, were not a condition precedent to the acts pertinent or necessary to that approval and, therefore, that the Circuit Court erred in declaring otherwise. In addition, Hovnanian's Motion to Modify Injunctions sought permission from the Circuit Court to request that the Department of Planning and Zoning extend the time period available for Hovnanian to seek site plan and subdivision approval for Four Seasons. The Circuit Court denied both Motions, whereupon Hovnanian noted an appeal to the Court of Special Appeals. The plaintiffs filed a cross-appeal.

The Court of Special Appeals, in an unreported opinion, reversed the judgment of the Circuit Court, including the injunction, holding that the enactment of Ordinances 01–01 and 01–01A constituted final legislative action granting Hovnanian's Growth Allocation Petition. The intermediate appellate court reasoned that the effectiveness of the approval of a Growth Allocation Petition did not depend upon the drafting, and therefore, the existence, of accurate Overlay Maps. Aggrieved, the plaintiffs filed a Petition for a Writ of Certiorari, which this Court granted. *Foley v. Hovnanian*, 399 Md. 595, 925 A.2d 634 (2007).

One of the central issues in this case is whether, where the ordinances approving a growth allocation petition, enacted by the County Commissioners, reference Critical Area Overlay Maps, the effectiveness of that approval depended on the existence of such maps and on their being filed with the ordinances when the ordinances were enacted.[6] We shall

---

**6.** We granted Certiorari to consider the following questions:

"1) What is the legal effect of an Ordinance enacted to create new Critical Area districts, when the Ordinance contains no information about the location of the new district boundaries?

"2) Does the Chesapeake Bay Critical Area Act allow intensive development in the Critical Area, absent delineation of a supporting development district on the official Critical Area Maps?

hold, for the reasons that follow, that amended Critical Area Overlay Maps do not have to be in existence when, or filed at the same time that, the ordinances granting the amendments reflected on the maps are enacted.

### III. Legal Analysis

■ Ordinances 01–01 and 01–01A memorialized the Queen Anne's County Commissioners' approval of Hovnanian's Growth Allocation Petition. They did so "by the repeal of Official Chesapeake Bay Critical Area Map Nos. 49 and 57 and *the adoption of the* attached Map Nos. 49 and 57 as the Official Chesapeake Bay Critical Area Map Nos. 49 and 57." *See* Queen Anne's County Ordinances 01–01 and 01–01A (Emphasis Added). The petitioners' first argument, therefore, is that Ordinances 01–01 and 01–01A are invalid because their text expressly and explicitly provided, and thus required, that revised Overlay Maps would be attached to the ordinances when, in actuality, none were. They assert that, because no Overlay Maps actually were attached to these Ordinances, enactment of these Ordinances by the Queen Anne's County Commissioners was a nullity. The petitioners reason that, without the Overlay Maps, the County Commissioners had no way of knowing the impact granting Hovnanian's Growth Allocation Petition would have or how the boundaries for the various development categories would be affected. They note that Hovnanian's request for growth allocation did not follow readily identifiable landmarks such as property lines or roadways, making the attachment of the referenced Overlay Maps even more critical, if not essential, to the ability of each of the

---

"3) Did the Circuit Court err by enjoining the County from acting upon development proposals which are predicated upon the re-classification of land until the re-classified land has been accurately delineated on the official Critical Area Maps?

"4) When a map amendment process concludes with the creation, approval and recordation of an official Critical Area map with demonstrable mistakes, is the proper procedure for correcting the mistakes the same as the statutory procedure created to correct other mistakes in the Program? If not, what law sets forth the specific steps the County must take to lawfully correct the mistakes?"

County Commissioners to understand the consequences of his or her vote. According to the petitioners, the absence of a metes and bounds description of the development boundaries or of text in the Ordinances directing a reader to a specific plat containing that information, made it impossible for the County Commissioners to know the location of the growth allocation they were approving and, therefore, its effect or impact on the Critical Area regime.

■ The Court of Special Appeals held that the petitioners waived the Overlay Maps issue. In reaching this conclusion, the intermediate appellate court referred not only to the record, but also to the Circuit Court's observation that "[a]ll parties recognize in one way or another that the action of the County Commissioners on August 21, 2001, represented final approval of the Hovnanian proposal in terms of the conditions stated in Ordinance 01–01A and other documents containing the County Commissioners' resolution of April 17, 2001, and conditions of the Planning Commission and CAC [the Critical Area Commission]." In the petitioners' brief to this Court, they proffer that they have preserved this argument for review, stating that "the issue was fully briefed in Plaintiff's (sic) [M]emorandum in [S]upport of Summary Judgment at pages E–21–22." [7] Brief of Appellants at 9.

■ Ordinarily, an appellate court will not review an issue that has not been preserved in the trial court. Maryland Rule 8–131(a) provides, in relevant part, that "[o]rdinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the

7. The record does contain the Plaintiffs' Memorandum in Support of Summary Judgment, but it is not where the Extract references indicated it is. The plaintiffs' Complaint for Declaratory and Injunctive Relief is at E. 21–22 of the Record Extract. The Plaintiffs' Memorandum in Support of Summary Judgment does not begin until E. 75. Our precedent has made it clear that every party has a responsibility not only to ensure that a proper record is made but also to refer the reviewing court to the proper location in the record carefully and accurately. *See King v. State Rds. Comm'n,* 284 Md. 368, 374 n. 3, 396 A.2d 267, 271 n. 3 (1979); *Tilghman v. Frazer,* 198 Md. 250, 258, 81 A.2d 627, 631 (1951).

trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal." The rationale for this preservation rule is the promotion of the orderly administration of the law and the desirability that all parties in a case have a fair opportunity to address fully the issues raised by opposing counsel. *See Brice v. State*, 254 Md. 655, 255 A.2d 28 (1969); *Basoff v. State*, 208 Md. 643, 119 A.2d 917 (1956).

On review of the Plaintiffs' Memorandum in Support of Summary Judgment, we are satisfied that the petitioners did preserve this issue for review. There, the petitioners argued:

"In this case though, there is no 'ambiguity.' Ordinance 01–01A clearly and unequivocally 'adopt[ed]' nothing more nor less than certain 'attached' maps. These words must be given meaning: the courts may 'not add words or ignore those that are there'. In fact, no maps were 'adopt[ed].' For this reason alone, Ordinance 01–01A must fall." (Citations and italics omitted).

■ The petitioners assert that since the maps were not attached to the Ordinances, as the Ordinances' text expressly and explicitly stated they would be, the Ordinances are invalid. This is especially so, they continue, because the Ordinances lacked any metes and bounds description indicating the location of the growth allocation the County Commissioners were authorizing. The petitioners rely on *Soron Realty Co. v. Town of Geddes*, 23 A.D.2d 165, 259 N.Y.S.2d 559 (N.Y.App. Div.1965).

In *Soron*, zoning amendments enacted by the Town of Geddes were challenged. In 1942, the Town of Geddes, the appellee, adopted a Zoning Ordinance under which property, owned by Soron Realty Co., Inc. (Soron) was unclassified. That property was leased by Solvay Iron Works, Inc. (Solvay), a small steel fabricating operation, which, in 1948, slowly began to expand its operations. The property remained unclassified until the zoning amendments at issue in *Soron* sought to classify it as Commercial A. In 1954, the Town of Geddes enacted amendments to the Zoning Ordinance that

reclassified multiple properties. Soron, 23 A.D.2d at 166, 259 N.Y.S.2d at 560. The property owned and leased by Soron and Solvay, the appellants, was one of the properties reclassified. Dissatisfied and because the reclassification adversely affected Solvay's business, the appellants challenged the validity of the 1954 Amendments.[8] Their challenge was two-fold. First, they argued that, before the enactment of the 1954 Amendments, the appellants had a nonconforming use as to the entire property. Second, they maintained that the enactment of the 1954 Amendments did not comply with the procedural requirements of a section of the Town Law. *Soron*, 23 A.D.2d at 166, 259 N.Y.S.2d at 561. It was the latter argument which the New York intermediate appellate court found persuasive and, thus, on which it based its holding.

Section 264 of the Town Law, the section on which the *Soron* appellants relied, required that "every amendment to a zoning ordinance (including any map incorporated therein) * * * shall be entered in the minutes of the town board * * * and a copy of such ordinance or amendment together with a copy of any map incorporated therein shall be posted on the sign board maintained by the town clerk." *Soron*, 23 A.D.2d at 167, 259 N.Y.S.2d at 561. Soron and Solvay asserted that the procedural requirements of Section 264 were not satisfied because the 1954 Zoning Amendments did not include a geographical description of the areas impacted by the amendments, nor were the new zoning maps entered into the Town Board's minutes. Additionally, Soron and Solvay argued that the 1954 Amendments were not enacted pursuant to Section 264 because no new zoning map was placed on the signboard maintained by the Town Clerk. *Soron*, 23 A.D.2d at 167, 259 N.Y.S.2d at 561.

---

8. The 1954 Zoning Amendments, by changing the zoning of the property to Commercial A, would have prohibited Solvay from operating its steel fabricating business except under a prior nonconforming use. *Soron*, 23 A.D.2d at 167, 259 N.Y.S.2d at 561. The Town of Geddes conceded that a nonconforming use existed on the petitioners' property, but maintained that it applied only to a portion of the premises.

The *Soron* court held that the Town Board's failure to comply with the procedural requirements of Section 264 rendered the 1954 Zoning Amendments invalid. *Soron*, 23 A.D.2d at 167, 259 N.Y.S.2d at 561. The intermediate appellate court reasoned that, in light of its earlier precedent, the Town Board's failure to publish the proposed New Zoning Map or to provide a geographical description of the affected properties denied to affected property owners the right to know the zoning classification of their property. *Soron*, 23 A.D.2d at 168, 259 N.Y.S.2d at 562.

The petitioners in the case *sub judice*, believing the cases to be factually quite close, proffer that, just as the *Soron* court found it essential that property owners have proper notice of zoning changes, Queen Anne's County residents also are entitled to know when and where the County Commissioners have awarded growth allocation. Because no maps were attached to Ordinances 01–01 and 01–01A, they argue that Queen Anne's County property owners, like the property owners in *Soron*, were deprived of this important and essential information.

The respondent does not agree. It proffers that, under the petitioners' view, literal intent would trump the real intention of the Queen Anne's County Commissioners in enacting Ordinances 01–01 and 01–01A. In support of this proposition, the respondent argues:

"In the case of a mistake in a reference in a statute to another statute, to a constitutional provision, or to a public document, record, or the like, where the real intent of the legislature is manifest, and would be defeated by an adherence to the terms of the mistaken reference, the mistaken reference will be regarded as surplusage, or will be read as corrected, in order to give effect to the legislative intent." (Footnotes omitted).

Quoting 73 Am.Jur.2d *Statutes* § 122 (2006). *See Tatlow v. Bacon*, 101 Kan. 26, 31, 165 P. 835, 837 (1917) (citing *Coney v. Mayor & Comm'rs of Topeka*, 96 Kan. 46, 49, 149 P. 689, 690 (1915)) (Legislative enactments containing errors, omissions or

mistakes will not be the basis for defeating a statute when the intent of the Legislature is obvious). *See also Metro. Life Ins. Co. v. Durkin,* 195 Misc. 1040, 1045, 91 N.Y.S.2d 26, 31–32 (1949). The respondent concludes: the failure of the Queen Anne's County Commissioners to attach Overlay Maps 49 and 57 should not overshadow the real intention of the Queen Anne's County Commissioners when they enacted Ordinances 01–01 and 01–01A, which was to approve Hovnanian's Growth Allocation Petition. We agree.

The preamble to Ordinance 01–01 provides:

"An act concerning the Repeal and Readoption with amendments of the Public Local Laws of Queen Anne's county (1996 Ed.) Title 14, *Environmental Protection,* 1996 Official Chesapeake Bay Critical Area Map Nos. 49 and 57.

"For the purpose of utilizing Critical Area Growth Allocation to redesignate 293.25 acres of property near Stevensville, Maryland from Resource Conservation Area (RCA) to Intense Development Area (IDA) and to utilize pre-mapped growth allocation to redesignate 79.55 acres of land from Limited Development Area (LDA) to Intense Development Area (IDA) by amending part of parcels 7, 8 and 11 on Queen Anne's County Official Chesapeake Bay Critical Area Map No. 49 and Parcels 1, 8, 347 and 532 on Official Chesapeake Bay Critical Area Map No. 57."

There seems to be no dispute, and certainly there is no doubt, that the land referred to in the preamble to Ordinance 01–01 is that belonging to the Four Seasons at Kent Island. Nevertheless, and even though the preamble unequivocally declares that Ordinance 01–01 was intended to utilize growth allocation for the Four Seasons property, the petitioners maintain that this Court should invalidate Ordinances 01–01 and 01–01A because no maps reflecting what the Commissioners approved had been drafted and no such maps were attached to the Ordinances. That is contrary to the court's duty, however.

This Court's task, when the meaning of legislation is at issue, is to ascertain and effectuate the real intent of the legislative body enacting it. *Andrews v. City of Greenbelt,* 293

Md. 69, 75, 441 A.2d 1064, 1068–69 (1982) (citing *Harbor Island Marina, Inc. v. Bd. of County Comm'rs*, 286 Md. 303, 311, 407 A.2d 738, 742 (1979)). To be sure, this interpretive principle applies whether the legislative enactment is by a state legislature or is one passed by a local legislative body. *See Trip Associates, Inc. v. Mayor & City Council*, 392 Md. 563, 573, 898 A.2d 449, 455–56 (2006) (citing *County Council v. E.L. Gardner, Inc.*, 293 Md. 259, 268, 443 A.2d 114, 119 (1982)); *O'Connor v. Baltimore County*, 382 Md. 102, 113, 854 A.2d 1191, 1198 (2004) ("Local ordinances and charters are interpreted under the same canons of construction that apply to the interpretation of statutes."); *Waters Landing Ltd. P'ship v. Montgomery County*, 337 Md. 15, 28, 650 A.2d 712, 718 (1994); *Village Square No. 1, Inc. v. Crow–Frederick Retail Limited Partnership*, 77 Md.App. 552, 562, 551 A.2d 471, 475 (1989) (interpreting City of Frederick, Maryland Code § 22–35). By enacting Ordinances 01–01 and 01–01A, the Queen Anne's County Commissioners intended to approve Hovnanian's project which required approval of its growth allocation petition. That was their real intent. If this Court were to adopt the petitioners' reasoning, we would be placing form over substance and disregarding the real intent of the Queen Anne's County Commissioners.

The petitioners' reliance on *Soron Realty Co. v. Town of Geddes*, 23 A.D.2d 165, 259 N.Y.S.2d 559 (1965) is not persuasive. The notice concerns in *Soron* are absent here. The proposition for which the petitioners rely on *Soron* is that, without the Overlay Maps attached to Ordinances 01–01 and 01–01A, Queen Anne's County landowners would not have notice of the development category into which the subject property would fall or of any contemplated change to that development category that the County Commissioners' approval of the Hovnanian Growth Allocation Petition would effectuate. This argument lacks merit because here, unlike in *Soron*, Queen Anne's County residents were given a description of the property that was being awarded growth allocation. In the preamble to Ordinance 01–01, approving the growth allocation at issue here, the Queen Anne's County Commis-

sioners reclassified "293.25 acres of property near Stevensville, Maryland ... by amending part of parcels 7, 8 and 11 on Queen Anne's County Official Chesapeake Bay Critical Area Map No. 49 and Parcels 1, 8, 347 and 532 on Official Chesapeake Bay Critical Area Map No. 57." The 1954 Zoning Amendments in *Soron*, on the other hand, contained no geographical description of the reclassified boundaries enacted by the Town Board, and Town Officials failed to publish the map containing such information. *Soron*, 23 A.D.2d at 166, 259 N.Y.S.2d at 561. Thus, citizens in the Town of Geddes had no way of knowing which properties were impacted by the reclassifications that occurred as a result of the 1954 Amendments. Ordinance 01–01, on the other hand, contained a geographical description of the properties that would be reclassified as a result of the County Commissioners' approval of Hovnanian's Growth Allocation Petition.

In addition, the growth allocation ordinances enacted in this case, unlike the zoning amendments enacted in *Soron*, only changed the development categories on one property, that belonging to The Four Seasons. Said otherwise, Ordinance 01–01 and 01–01A did not intend to affect the level of development that any surrounding landowners could engage in because the ordinances only altered the classification of the development categories on the Four Seasons' property. *See* Q.A.C.C. § 14:1–77(A) ("A request for growth allocation petition may be initiated by a *petition of the property owner filed with the County Commissioners.*" (Emphasis added)). Thus, growth allocation is awarded only to property owners that file the requisite petition with the Queen Anne's County Commissioner.

To be sure, like zoning, where non-petitioning landowners can be affected by a county's legislative acts, *see Harbor Island Marina v. Board of County Commissioners*, 286 Md. 303, 312–13, 407 A.2d 738, 743 (1979) (stating that Maryland counties within the limits of the police power, have broad authority to exercise zoning powers), the award of growth allocation can affect the property of a non-growth allocation awardee. That is not the concern that the *Soron* case ad-

dressed. There was ample notice to the surrounding property owners of Hovnanian's petition for growth allocation. Indeed, Robert W. Foley, the named petitioner in this case, addressed the Critical Area Commission on September 12, 2000 about Hovnanian's Growth Allocation Petition. Moreover, Foley was informed about Hovnanian's Growth Allocation Petition for Four Seasons, as were other contiguous property owners pursuant to Q.A.C.C. § 14:1–77(B).[9] Q.A.C.C. § 14:1–77(B) required that an announcement of the public hearing on Hovnanian's Growth Allocation Petition be published in a County newspaper at least 14 days prior to the hearing before the Planning Commission. The ample notice that both Foley and Queen Anne's County residents received further detracts from Foley's argument that notice, or the lack thereof, was an issue when Queen Anne's County Commissioners enacted the Ordinances with no maps attached. There simply is no issue of the kind addressed in *Soron*, whether the property owner whose property had been reclassified had notice, or sufficient notice, of the reclassification.

■ The central point of contention in this case is whether accurate Overlay Maps had to be drafted and filed with the approving ordinances, which the County Commissioners enacted, in order for Hovnanian's growth allocation to be effective. The petitioners refer this Court to Maryland Code (2000 Repl. Vol., 2006) § 8–1808.1(c)(4) of the Natural Resources Article:

9. Q.A.C.C. § 14:1–77(B) reads:

"Planning Commission; referral, investigation and recommendation. All growth allocation petitions shall be referred to the Planning Commission for investigation and recommendation. The Planning Commission shall first hold a public hearing at which parties of interest and citizens shall have an opportunity to be heard. At least 14 days' notice of the time and place of such hearing shall be published in a newspaper of general circulation in the County. In addition, the Planning Commission shall post notice of its public hearing on the property for which growth allocation is requested and, to the extent possible based on the best available information, notify all property owners immediately contiguous to the property of the hearing date, time and place."

"New intensely developed or limited development areas to be located in the resource conservation area shall conform to all criteria of the Commission for intensely developed or limited development areas and shall be designated on the comprehensive zoning map submitted by the local jurisdiction as part of its application to the Commission for program approval or at a later date in compliance with § 8–1809(g) of this subtitle[.]"

We disagree with the petitioners' reliance on that section.[10] Section 8–1808.1(c)(4) addresses a county's initial establishment of a Critical Area Program and the periodic review of that program that counties must undertake as required by § 8–1809(g) of the Natural Resources Article.[11] In Maryland

---

**10.** The Circuit Court below believed that Q.A.C.C. § 14:1–17(B) was dispositive on the issue of whether accurate Critical Area Overlay Maps had to be drafted before or contemporaneous with the County Commissioners' award of growth allocation. Q.A.C.C. § 14:1–17(B) reads as follows:

"ARTICLE IV Boundaries; Interpretations; Maps
* * *

"B. Development areas. For the purposes of this Chapter 14:1, all land and water areas in Queen Anne's County which are located within the critical area are hereby divided into one of three development areas as determined by the criteria established for each development area in this Chapter 14:1 and as delineated on the official Critical Area Maps of Queen Anne's County, as they may be amended from time to time, which, together with any explanatory materials thereon, are hereby made a part of this Chapter 14:1:(1) Intensely developed area (IDA); (2) Limited development area (LDA); or (3) Resource conservation area (RCA)."

The Court of Special Appeals rejected the Circuit Court's reliance and interpretation of Article IV:

"Use of the conjunctive in this section [the conjunctive "and" in Q.A.C.C. § 14:1–17(B) ] led the court to conclude that approval and delineation were distinct acts, but also led the court to conclude that 'until both requisites are met, a development area remains as it was before any amendatory action.' We disagree. Section 17.B is part of Article IV of Part 4 of Chapter 14:1. Part 4 deals with the 'Establishment of Development Areas.' We deal here with growth allocations. The more particular provisions concerning map amendments utilizing growth allocations are found in Article XV of Chapter 14:1."

**11.** Maryland Code (2007 Repl. Vol.) § 8–1809(g) reads:

"(g) *Review and proposed amendment of entire program.*—Each local jurisdiction shall review its entire program and propose any necessary

Code (2000 Repl. Vol., 2006) § 8–1808 of the Natural Re-
sources Article, local jurisdictions are directed to establish a
Critical Area Program, such as the one adopted by Queen
Anne's County, that establishes certain land use policies for
development in areas surrounding the Chesapeake Bay. Mary-
land Code (2000 Repl. Vol., 2006) § 8–1809(g) of the Natural
Resources Article provides that "[e]ach local jurisdiction shall
review its entire program and propose any necessary amend-
ments to its entire program, including local zoning maps, at
least every 4 years beginning with the 4–year anniversary of
the date that the program became effective and every 4 years
after that date." As pointed out by the respondent, this
statutory language does not require or even imply that Over-
lay Maps for every award of Growth Allocation by County
Commissioners be added before any such Growth Allocation
Petition can be approved and become effective. Instead, § 8–
1808.1(c)(4) and § 8–1809(g) require only that maps outlining
newly classified IDA or LDA areas be provided to the Chesa-
peake Bay Critical Area Commission at the inception of a
county's program and every four years thereafter. As neither
§ 8–1808 nor § 8–1809 addresses the specific role that Over-
lay Maps play in the Growth Allocation Petition process, and
more particularly, whether the effectiveness of the County
Commissioners' approval of Hovnanian's Growth Allocation
Petition is contingent on the attachment to the Ordinances of
accurate Critical Area Overlay Maps depicting the approved
Growth Allocation, we turn our attention to Q.A.C.C. § 14:1–
77.

---

amendments to its entire program, including local zoning maps, at least
every 6 years. Each local jurisdiction shall send in writing to the
Commission, within 60 days after the completion of its review, the
following information:
 "(1) A statement certifying that the required review has been accom-
plished;
 "(2) Any necessary requests for program amendments, program re-
finements, or other matters that the local jurisdiction wishes the
Commission to consider;
 "(3) An updated resource inventory; and
 "(4) A statement quantifying acreages within each land classification,
the growth allocation used, and the growth allocation remaining."

Article XV, § 14:1–77 of the Queen Anne's County Code addresses the Growth Allocation Petition process. Q.A.C.C. § 14:1–77(F) and (G) provide:

"F. Final approval by the County Commissioners.

"(1) Within 120 days of receiving notification from the Critical Area Commission that the proposed growth allocation petition has been conditionally approved pursuant to the provisions of § 8–1809 of the Natural Resources Article of the Annotated Code of Maryland, the County Commissioners shall introduce legislation and take final legislative action on the proposed growth allocation.

(2) If the Planning Commission has recommended approval of a growth allocation petition and the County Commissioners propose to approve an award of growth allocation which substantially changes or departs from those recommendations, the proposal of the County Commissioners shall be referred to the Planning Commission, in writing, for its further recommendations and to the Critical Area Commission for review and approval prior to any legislative action. If such recommendations are not received by the County Commissioners within 90 days after the proposal has been transmitted to the Planning Commission, the County Commissioners may proceed to take final action without such recommendations.

(3) A growth allocation petition shall not be effective until after it is approved by the Critical Area Commission and not until 45 days after approval by the County Commissioners.

"G. Map amendment. The Official Critical Area Map(s) will be amended to reflect the new development area designation when the approved growth allocation petition becomes effective."

Pursuant to Queen Anne's County Code § 14:1–77(F), there is a 45 day waiting period between the time when the Queen Anne's County Commissioners' approve an applicant's petition for growth allocation and when that applicant's approved petition can become effective. Thus, approval of a petition for

growth allocation and the effectiveness of the approved petition are not events that occur simultaneously.

When presented with a question involving statutory interpretation, we begin with the words of the ordinance "since the words of the [ordinance], construed according to their ordinary and natural import, are the primary source and most persuasive evidence of legislative intent." *Lanzaron v. Anne Arundel County*, 402 Md. 140, 149, 935 A.2d 689, 694 (2007) (quoting *Rose v. Fox Pool Corp.*, 335 Md. 351, 359, 643 A.2d 906, 909 (1994)). Our goal is to effectuate the intent of the legislative body. *Comptroller of the Treasury v. Science Applications Int'l Corp.*, 405 Md. 185, 198, 950 A.2d 766, 773 (2008); *Ishola v. State*, 404 Md. 155, 160, 945 A.2d 1273, 1276 (2008); *Taylor v. Mandel*, 402 Md. 109, 128, 935 A.2d 671, 682 (2007). This Court will neither add nor delete language in a statute so as to subvert that body's plain and unambiguous intent in enacting the particular legislation. *Maryland Overpak Corp. v. Mayor & City Council*, 395 Md. 16, 47, 909 A.2d 235, 253 (2006) (quoting *Kushell v. Dep't of Natural Res.*, 385 Md. 563, 576–77, 870 A.2d 186,.194 (2005)). We construe the ordinance so as to give effect to each word so that no word, clause, sentence or phrase is rendered superfluous or nugatory. *Kushell*, 385 Md. at 577, 870 A.2d at 193 (citing *Collins v. State*, 383 Md. 684, 691, 861 A.2d 727, 732 (2004)). Thus, if an ordinance is clear and unambiguous, our inquiry is at an end. *Kushell*, 385 Md. at 577, 870 A.2d at 193–94. If, however, the language in an ordinance is ambiguous, then we will look to external sources in an effort to glean the legislature's intent. *Kushell*, 385 Md. at 577, 870 A.2d at 194.

In outlining the process for the Queen Anne's County Commissioners to approve a Growth Allocation Petition, § 14:1–77(F) provides, in part, that within 120 days of receiving the Critical Area Commission's conditional approval of a proposed growth allocation petition, the County Commissioners must introduce legislation and take "final legislative action" on the proposed growth allocation. Q.A.C.C. § 14:1–77(F)(1). If, however, the County Commissioners propose to

approve a growth allocation petition that substantially deviates from the terms of a proposed petition that previously has been reviewed and approved by the Planning Commission and the Critical Area Commission, then the County Commissioners must, in writing, once again refer the revised petition, with the Commissioners' proposed changes, to the Planning Commission and to the Critical Area Commission. In the absence of further action or recommendation on the revised petition by the Planning Commission or the Critical Area Commission within 90 days, the County Commissioners "may proceed to take final action without such recommendations." Q.A.C.C. § 14:1–77(F)(2).

The first mention of Critical Area Overlay Maps occurs in Q.A.C.C. § 14:1–77(G):

"G. Map amendment. The Official Critical Area Map(s) will be amended to reflect the new development area designation when the approved growth allocation petition becomes effective."

The fact that Q.A.C.C. § 14:1–77(G) is not found in the subsection entitled "Final approval by the County Commissioners" is significant. It indicates, or at least is some evidence, that the amendment of Critical Area Overlay Maps is not a precondition to the authority of the County Commissioners to give final approval to a growth allocation petition. *See Morris v. Prince George's County*, 319 Md. 597, 604, 573 A.2d 1346, 1349 (1990) (explaining that the interpretation of a statute is influenced by the context in which it appears).

There is not one word in § 14:1–77(G) to which the petitioners have pointed, and this Court has found none, that indicates that accurate Critical Area Overlay Maps have to be drafted and filed before the County Commissioners' approval of a growth allocation petition will take effect.[12] Instead, the

---

**12.** Initially, one might argue that the word "reflect" in Q.A.C.C. § 14:1–77(G) would be dispositive of whether accurate Critical Overlay Maps had to be drafted and attached to the Ordinance before or contemporaneous with the County Commissioners' award of growth allocation to Hovnanian. The word "reflect," depending on the context in which it

interplay between Q.A.C.C. § 14:1–77(F)(3) and (G) leads us to conclude that Queen Anne's County Commissioners could have, as they did, approve Hovnanian's Growth Allocation Petition whether, or not, there was in existence at the time, and attached to the Ordinances, amended Overlay Maps reflecting the decision made by the County Commissioners. In particular, Q.A.C.C. § 14:1–77(F)(3) provides that "[a] growth allocation petition shall not be effective until after it is approved by the Critical Area Commission and not until 45 days after approval by the County Commissioners." Q.A.C.C. § 14:1–77(G) provides that the "Official Critical Area Map(s) will be amended ... when the approved growth allocation petition becomes effective." Thus, the Queen Anne's County Code did not contemplate that amended Overlay Maps had to be drafted and attached in order that the Queen Anne's County Commissioners' Growth Allocation Petition approval take effect. Whether amended Overlay Maps reflecting the approved Growth Allocation Petition must be drafted, thus, be in existence, in order for the approval to be effective is a closer question.

Queen Anne's County Code § 14:1–77(G) does not make clear whether amended Critical Area Overlay Maps must exist before or after an approved Growth Allocation Petition becomes effective. As we have seen, it requires, "[t]he Official Critical Area Map(s) [to] be amended to reflect the new development area designation when the approved growth allocation petition becomes effective." Thus, the words of Q.A.C.C. § 14:1–77(G), giving them their plain meaning, does not indicate when the Critical Area Overlay Maps must be amended and, thus, they do not provide for when the amendments must be prepared. The only temporal indicator that

_____

is used, can have two different meanings. For instance, "reflect" can mean "to remember with thoughtful consideration," implying that an event already has occurred. Webster's Third New International Dictionary, 1976. Alternatively, the word "reflect" can mean "to bring about a specified appearance or characterization," suggesting that, at least from a temporal standpoint, the event is occurring contemporaneously. Webster's New Collegiate Dictionary, 1973.

Q.A.C.C. § 14:1–77(G) provides in this regard is that it uses the word "when" in connection with the requirement that the Critical Area Overlay Maps be amended. The word "when" is defined as "during the time at which; while" or "at the time that." American Heritage College Dictionary, Third Edition. In the context of Q.A.C.C. § 14:1–77(G), the word "when" is ambiguous in that no clear answer is provided to the question whether amended Critical Area Overlay Maps are prerequisite to the effectiveness of an approved growth allocation petition. Because Q.A.C.C. § 14:1–77(G) is ambiguous, and does not answer the question presented, we will attempt to glean the legislature's intent by reviewing the general purpose of Q.A.C.C. § 14:1–77 and how that purpose is served by the competing interpretations of the statute proffered by the parties. *Witte v. Azarian,* 369 Md. 518, 526, 801 A.2d 160, 165 (2002).

Queen Anne's County Code § 14:1–3 states, in relevant part, that the purpose underlying "Chapter 14:1 is to establish the critical area and to provide special regulatory protection for the land and water resources located within the Chesapeake Bay critical area in Queen Anne's County." Q.A.C.C. § 14:1–3. Q.A.C.C. § 14:1–6 codifies the interpretive principles that the Queen Anne's County Commissioners prescribed for reviewing administrative or judicial bodies to apply when interpreting the provisions of Chapter 14:1. These interpretive principles include determining whether an interpretation of a specific provision within Chapter 14:1 is consistent with the goals and objectives of the Critical Area Program in Maryland Code § 8–1801 et seq. of the Natural Resources Article. *See* Q.A.C.C. § 14:1–6. Q.A.C.C. § 14:1–6 emphasizes that "[t]his Chapter 14:1 has been carefully designed by the County Commissioners of Queen Anne's County to avoid regulations that either sacrifice legitimate public goals ... or require undue limitations on the ability of property owners to use their land in manners consistent with the goals of the program." Q.A.C.C. § 14:1–6(A)(4). Reviewing bodies are also admonished that "great care should be taken by those interpreting this Chapter 14:1 not to substitute their judgments for

the legislative acts of the County Commissioners." Q.A.C.C. § 14:1–6(A)(4). In light of the principles articulated in Q.A.C.C. § 14:1–6, we conclude that the interpretation given Q.A.C.C. § 14:1–77(G) by the petitioners is unpersuasive and contrary to the interpretive principles articulated in Q.A.C.C. § 14:1–6.

The respondent contends that this Court should hold that accurate amended Overlay Maps do not have to be prepared as a precondition to the approved growth allocation taking effect or being effective. Hovnanian asserts that "[w]ith no statutory provision as to procedures, investigations, hearings, timeframes, standards, public notice and/or participation in connection with the drafting of Overlay Maps, it is clear that drafting Overlay Maps is a ministerial function." Brief of Respondent at 27. From a practical perspective, Hovnanian maintains that it would be absurd for this Court to conclude that the County Commissioners' legislative approval of a growth allocation petition has no substantive effect until County personnel, charged with the duty of drafting Overlay Maps, decide to perform their duty. The petitioners, on the other hand, assert that Hovnanian cannot be permitted to use the approved Growth Allocation until accurate Overlay Maps have been drafted because "[c]learly delineated land use boundaries are essential." Brief of Petitioners at 15. Without accurate Overlay Maps depicting the boundaries of the Growth Allocation the County Commissioners approved, the petitioners posit that regulatory authorities would have no way of knowing whether development activity at a particular location is consistent with the law.

We disagree with the petitioners and conclude that their interpretation would, in effect, and contrary to Q.A.C.C. § 14:1–6, permit Queen Anne's County employees "to substitute their judgments for the legislative acts of the County Commissioners." This is a result that we cannot endorse. The holding of the Court of Special Appeals in *Clarke v. Greenwell*, 73 Md.App. 446, 534 A.2d 1344 (1988) informs our decision.

The court in *Clarke* was asked to determine whether the appellee in that case timely filed an appeal to the decision of the St. Mary's County Commissioners to rezone a parcel of land. *Clarke v. Greenwell,* 73 Md.App. 446, 447, 534 A.2d 1344 (1988). Critical to that determination was the question of when the St. Mary's County Commissioners took final legislative action in the matter. In order to make that determination, the court looked to the St. Mary's County Zoning Code § 20.03, which read:

> "If, in accordance with the provisions of this Ordinance and Article 66B of the Annotated Code of Maryland as amended, changes are made in . . . matter[s] portrayed on the Official Zoning Maps, such changes shall be made a part of the Official Zoning Maps promptly after the amendment has been approved by the County Commissioners. . . . *No amendment to this Ordinance which involves a matter portrayed on the Official Zoning Maps shall become effective until after such change has been made a part of said maps."* St. Mary's County Zoning Code, § 20.03 (Emphasis Added).

In February of 1985, the appellant, Joseph Abel Clarke filed a Rezoning Application with the St. Mary's County Office of Planning and Zoning. *Clarke,* 73 Md.App. at 447–48, 534 A.2d at 1344. Clarke's application sought to have his property rezoned from R–1 (Rural Residential) to CM (Commercial Marine). The County Commissioners approved the change on August 19, 1986. Subsequently, however, Clarke received a letter from the Office of Planning and Zoning that stated that "[t]he change will become effective when, according to Section 20.03, a signed survey of the area rezoned is attached to the official zoning map." *Clarke,* 73 Md.App. at 450, 534 A.2d at 1346. The survey was not attached to the official zoning map until almost five months later. *Id.* at 451, 534 A.2d at 1346.

On the thirty-first day after the St. Mary's County Commissioners approved rezoning, and the day on which Clarke was advised of when the change would take effect, Joseph A. Greenwell, the appellee, noted an appeal in St. Mary's County Circuit Court. Clarke moved to dismiss the appeal, with

158

prejudice, arguing that the appeal was filed one day late and, therefore, the Circuit Court lacked jurisdiction to hear the case. He relied on Maryland Rule B4(a), which provided: that rule required an order for appeal from an administrative agency decision to be filed within thirty days of the date of the action on which review is sought. *Clarke*, 73 Md.App. at 449, 534 A.2d at 1345. The Circuit Court ruled in favor of the appellants. Because the zoning changes had not yet been made on the map, the decision to rezone was not final, with the result that no appeal could have been taken from the decision of the County Commissioners. *See* Maryland Rule B1(a) (requiring that an order seeking judicial review of an administrative agency decision be filed within thirty days after the date of the decision.).

The Court of Special Appeals reversed, reasoning that it would be inconceivable for the "ministerial act" of attaching changes to the zoning map, notwithstanding the explicit language in § 20.03 of the St. Mary's County Code, to be the dispositive factor in determining the finality of an action by a legislative body. *Clarke*, 73 Md.App. at 452, 534 A.2d at 1347. It held that the appellee's appeal was untimely. Specifically, the intermediate appellate court pointed out that, if the literal words of § 20.03 were to be given effect, then numerous people that possessed the power and duty to affix zoning changes to the official maps would be vested with the ability unilaterally to supersede the legislative decision-making of the County Commissioners. Therefore, the court concluded, that it could not have been the intent of the County Commissioners to vest third-persons with the authority to overrule their decisions. *Id.* at 447, 534 A.2d at 1344.

The *Clarke* holding and its rationale is applicable to the resolution of the case *sub judice*. Were we to adopt the petitioners' reasoning, the Queen Anne's County employees, responsible for drafting Critical Overlay Maps, and amendments to them, would be vested with the power to delay, or even completely preclude, an approved growth allocation petition from becoming effective. They would have, in effect, veto authority. That would, in essence, undermine, if not nullify

completely, Q.A.C.C. § 14:1–77(F), which vests Queen Anne's County Commissioners with the authority to exercise "final legislative action" on growth allocation petitions. It would also be inconsistent with Q.A.C.C. § 14:1–77(G), which, to the contrary, judging from the words used, contemplates that County Commissioners would have just such authority. Accordingly, we hold that adoption and filing of amended Critical Area Overlay Maps were not prerequisites, conditions precedent, either to the Queen Anne's County Commissioners' approval of Hovnanian's Growth Allocation Petition or its being effective. The drafting of amended Critical Area Overlay Maps quite simply is a ministerial function that necessarily must occur subsequent to an award of Growth Allocation becoming effective.

The petitioners next contend that, without accurate amended Critical Area Overlay Maps, regulatory authorities will not be able to ascertain whether development activity at a particular location is lawful. We do not agree. To be sure, as the respondent acknowledges, while Overlay Maps must be as accurate as possible, with particular reference to the maps in this case, the drafting of Critical Area Overlay Maps is "not an exact exercise" and is "perhaps impossible." Mr. Nuttle, the court appointed surveyor, confirmed this point. Commenting on the attendant difficulties of drafting accurate Overlay Maps, he said:

"I was specifically asked to review several documents, Sheet 7 of the Sketch/Concept Plan by McCrone and numbers 49 and 57 of the Chesapeake Bay Critical Area overlays to determine any differences. I was also asked [to] give an opinion as to the extent that these differences were the result of tax map inaccuracies and differences in the scales used.

\* \* \*

"The Chesapeake Bay Critical Area maps were apparently made by using the tax maps as a base. Some land use lines were made by scaling specified distances from natural features such as shore lines, creeks, wetlands, etc. Others

were obviously made by following property lines shown on the tax maps. The assessment people have done a great job with their maps, but the maps are too inaccurate both as to the position of property lines and of shore lines."

Notwithstanding the inaccuracies that seem to be inherent in the drafting process for Critical Area Overlay Maps, the petitioners maintain that, before an applicant can use an admittedly approved growth allocation, accurate Overlay Maps must be drafted and themselves filed with the ordinances. Only then, they submit, can regulatory authorities determine whether a developer is conducting development activity lawfully. Again, we disagree. The petitioners seem not to appreciate that all growth allocation applicants are required to submit sketch or concept plans with their petitions and that no such petition may be approved without them. A sketch or concept plan is required to contain a detailed description of the property as to which an award of growth allocation is sought. Moreover, pursuant to Q.A.C.C. § 14:1–76, the sketch or concept plan must include the recommendations made by the Planning Commission. Thus, it will have been reviewed by the Planning Commission. Only then will this sketch or concept plan be submitted to the Critical Area Commission. It follows, therefore, that the reviewing agencies, the Planning Commission, the CAC and the regulating body, the County Commissioners, are well aware of the property to be developed. Consequently, should the exact location of growth allocation ever be in question and there are no approved Critical Area Overlay Maps reflecting the award, either because they have not yet been drafted or contain cartographic errors, the regulatory authorities, contrary to the petitioners' assertions, need only to look to the approved sketch or concept plans for clarification.

The petitioners also ask this Court to determine the procedures to be followed to correct the cartographic errors found on the most recent Critical Area Overlay Maps. They assert that Maryland Code (2000 Repl. Vol., 2006) § 8–1809(*l*)

of the Natural Resources Article outlines the procedures to be followed. That section provides:

"(*l*) *Correction of clear mistakes, omissions, or conflicts with criteria or laws.*

"(1) If the Commission determines that an adopted program contains a clear mistake, omission, or conflict with the criteria or law, the Commission may:

"(i) Notify the local jurisdiction of the specific deficiency; and

"(ii) Request that the jurisdiction submit a proposed program amendment or program refinement to correct the deficiency.

"(2) Within 90 days after being notified of any deficiency under paragraph (1) of this subsection, the local jurisdiction shall submit to the Commission, as program amendments or program refinements, any proposed changes that are necessary to correct those deficiencies.

"(3) Local project approvals granted under a part of a program that the Commission has determined to be deficient shall be null and void after notice of the deficiency."

Md. Code (2000 Repl. Vol., 2006) § 8–1809(*l*), Natural Resources Article.

The petitioners urge us to hold, as they maintain, that § 8–1809(*l*) clearly indicates the Legislature's intent to prohibit "informal manipulation of Critical Area boundaries lacking public process or oversight by the Critical Area Commission."

The respondent, not unexpectedly, does not agree. Rather than challenging the petitioner's interpretation of § 8–1809(*l*)(1), it submits that it is inapposite. It argues that an "adopted program," as referenced and used in § 8–1809(*l*)(1) refers to the County's initial establishment of a Critical Area Program. At issue here is "Growth Allocation," an entirely different issue, requiring considerations that also are completely different. Indeed, the respondent maintains that nothing in § 8–1809 requires that formal amendment procedures be followed to correct mere ministerial mapping errors. We agree.

Q.A.C.C. § 14:1–77(G) is of no assistance either. Section 14:1–77(G) does not contain a procedure, formal or informal, for correcting an erroneous Critical Area Overlay Map. And, the petitioners have not, and we believe cannot, point this Court to any statutory language that would suggest that there is a formal procedure that must be followed for the correction of cartographic errors on Critical Area Overlay Maps to be corrected once an applicant's growth allocation petition has been approved and has become effective. This conclusion is confirmed by reference to Q.A.C.C. § 14:1–77(G), which does not mention or even remotely suggest that there is a formal process that must be followed in order to correct cartographic errors on Overlay Maps. In the absence of a procedure prescribed legislatively for correcting cartographic errors on Critical Area Overlay Maps and consistent with our holding today, we believe Queen Anne's County employees may, indeed must, correct, as revealed, drafting errors, on the County's Critical Area Overlay Maps.

 The final issue that we shall address emanates from the petitioners' argument that, due to the absence of attached maps, Ordinances 01–01 and 01–01A were nullities. Here, the petitioners contend that the administrative record makes it impossible to know if Queen Anne's County Commissioners actually approved Hovnanian's 2000 or 2001 Growth Allocation Plan. According to the petitioners, "There is absolutely nothing contained in the record of this case that indicates that the 2001 plan was ever presented to the County Commissioners[.]" Brief of Appellants at 24. As the boundaries on the 2000 and 2001 Growth Allocation Plans were different, the petitioners assert that the only remedy to clarify this issue is to require the Critical Area Commission and the County Commissioners to go through the process of reapproving Hovnanian's 2001 Growth Allocation Plan.

The respondent counters that "[a] fair reading of the administrative record makes it abundantly clear that on June 14, 2001, the County Planning Commission approved the 2001 Growth Allocation Plan (Sheet of 7), and on July 11, 2001, the

Critical Area Commission approved the same plan." Brief of Respondent at 38. The Court of Special Appeals agreed and held that there was no basis for the court to conclude that the Critical Area Commission or the County Commissioners approved anything other than Hovnanian's 2001 Growth Allocation Plan. We agree with the Court of Special Appeals.

We begin by noting that "[i]n the absence of evidence to the contrary, administrative officers will be presumed to have properly performed their duties." *See Johnstown Coal & Coke Co. v. Dishong,* 198 Md. 467, 474, 84 A.2d 847, 849 (1951); *Armco Steel Corp. v. Trafton,* 35 Md.App. 658, 671, 371 A.2d 1128, 1134 (1977). The record makes it abundantly clear that after the Queen Anne's County Commissioners passed Resolution No. 01–13 on May 23, 2001, and Hovnanian subsequently submitted an Amended Concept/Sketch Plan (the 2001 Growth Allocation Plan) to reflect the conditions mandated by that Resolution, all administrative agencies voted to approve the 2001 Growth Allocation Plan. The primary evidence that supports this conclusion is a June 14, 2001 letter addressed to the Queen Anne's County Commissioners from the Planning Commission which stated, in relevant part:

"The Planning Commission was directed to review *the amended concept/sketch plan that reflects, where applicable, the conditions contained in County Commissioner Resolution No. 01–13 and make any further recommendations deemed appropriate.* The Planning Commission reviewed the project on June 14, 2001 and offers no objection to the 25 conditions contained in County Commissioner Resolution 01–13. The Planning Commission offers a favorable recommendation for the County Commissioners to take final action on the award of Growth Allocation to change 293.25 acres of RCA land to IDA and redesignation of 79.55 acres of Critical Area land from LDA to IDA with no additional conditions or recommendations." (Emphasis Added).

As further evidence that there was no confusion about which of Hovnanian's Growth Allocation Plans was being approved by the responsible administrative agencies, we refer to the

**164**

July 13, 2001 letter from the Chesapeake Bay Critical Area Commission to Queen Anne's County Planning Commission. In that letter, the Commission stated, in relevant part:

"At its meeting of July 11, 2001, the Chesapeake Bay Critical Area Commission voted to confirm its previous approval of the request for growth allocation for the Four Seasons at Kent Island project. *It was noted that the amended concept plan reflects the conditions placed on the Critical Area Commission approval through graphic depiction or plat notes.*" (Emphasis Added).

The repeated references to the "amended concept/sketch plan" and the "amended concept plan" in the letters above clearly demonstrate that neither Queen Anne's County Commissioners nor the Chesapeake Bay Critical Area Commission was confused about the Growth Allocation Plan that each approved. To the contrary, the letters illuminate the fact that both agencies knowingly approved Hovnanian's 2001 Growth Allocation Plan.

**JUDGMENT AFFIRMED WITH COSTS.**